Suzanne OSGOOD, Plaintiff,

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civ. A. No. 81–1255.

United States District Court, District of Columbia.

July 5, 1983.

Robert Carson Godbey, Ellen Godbey Carson, Washington, D.C., for plaintiff.

Cary D. Pollak, Asst. Corp. Counsel, District of Columbia, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment and defendants' motion to dismiss or for summary judgment. Plaintiff charges that while she was an inmate at the District of Columbia Detention Facility (the D.C. Jail) defendants forcibly injected her with a psychotropic drug, against her will and despite the fact that she refused all medical treatment on the ground that she is a Christian Scientist and adheres to the tenets of that faith which, she asserts, require her to reject the use of medical and psychiatric science in the healing process. She alleges that as a result various of her constitutional rights have been violated, and seeks compensatory and punitive damages therefor pursuant to 42 U.S.C. § 1983. She also charges defendants with assault and battery under the law of the District of Columbia, for which she also seeks compensatory and punitive damages.

For the reasons which follow, three counts of the complaint are dismissed, the complaint is dismissed as to one defendant sued in his individual capacity (but allowed to stand against him in his official capacity), the complaint is dismissed as to defendant District of Columbia, and summary judgment is denied to both plaintiff and defendants. In providing some examples as to disputes of material facts which preclude entry of summary judgment for either side, this Memorandum Opinion does not purport to address *all* potential issues that may be raised at trial. Rather, it simply demonstrates by way of example why summary judgment is inappropriate.

While the parties dispute certain facts, there is no controversy as to the following matters (except as noted). Plaintiff was in custody as a patient at St. Elizabeths Hospi-

tal from November 28, 1979 to April 1, 1980. She has a history of several previous psychiatric hospitalizations and three suicide attempts. She was incarcerated at the D.C. Jail from April 1, 1980 until July 7, 1980, and again from October 10, 1980 until November 18, 1980. She was sentenced on October 16, 1980 for her conviction on a charge of assaulting a federal officer (arising from her having gone to the congressional office of Senator Edward M. Kennedy with a knife), after a jury trial. On April 1, 1980, plaintiff informed jail personnel that she refused, on the basis of her Christian Science beliefs, to receive medical or psychiatric treatment or examination. She signed a form document noting her refusal of "any and all Medical Treatment, and/or tests, prescribed by the Physicians of the Detention Services and/or the Physicians of the D.C. General Hospital." Def. Exh. A. That form bore a handwritten notation to the effect that she refused to provide any medical history data or submit to a physical examination "stating she is a Christian Scientist." *Id.* A form labeled "Physical Examination" and dated April 4, 1980 was not completed but carried the statement of an examining doctor that "This inmate is very belligerent and threatens me to not come near her. No exam performed." Def. Exh. B. *See also* Def. Exh. C ("Consultation Sheet," noting her refusal to attend a screening clinic).

During the entirety of plaintiff's stay at the D.C. Jail, except for the afternoon of June 4, 1980, her refusal to submit to medical treatment or examination was honored. According to defendant, this was even though she demonstrated what defendants referred to as "abnormal behavior" as early as April 4, 1980. Def. Exhs. B, C, D (Declaration of defendant Francis Smith, M.D.); Smith Aff. at 18. On that afternoon, she was forcibly injected with the antipsychotic or psychotropic drug Haldol, against her will.

Plaintiff has not directly challenged defendants' description of the events leading to her injection with Haldol that day. According to defendants, earlier that day a psychiatric nurse named David Avery (who had been familiar with plaintiff's behavior since as early as April 4, 1980, *see* Exh. C) determined that her condition warranted evaluation by a psychiatrist from the forensic Psychiatry Office "ASAP." Def. Exh. E. He made a record of his observations noting that she was "withdrawn," not communicative, "verbally abusive (cursing and calling other names)," and that she was wearing a blindfold and sleeping under her bed. *Id.* Plaintiff admits that she had a scarf covering her eyes and was sleeping under her bed to "avoid the lights" because her eyes "are very sensitive to light." Plaintiff's Answers to Interrogatories Nos. 24, 27. She also admits that she screamed once and banged her chair once, but asserts that such behavior was common among inmates. Complaint ¶ 16. Defendant Francis Smith, M.D., the Chief Medical Officer at the D.C. Jail, upon being advised of plaintiff's condition, requested an evaluation by the Forensic Psychiatry Office.

Plaintiff was then examined by Norman L. Wilson, M.D., a forensic psychiatrist who knew of plaintiff's prior bizarre behavior and also of her alleged visit to Senator Kennedy's office with a knife. Def. Exh. F (Wilson Declaration). He stated that when he saw her she was screaming insults and threatened that she would kill him and the staff members present if she could. *Id.* (Plaintiff denies that she ever threatened to kill anyone that day, but admits screaming verbal insults at Dr. Wilson and threatening to sue him and the staff members present for violating her constitutional rights. Osgood Aff. ¶ 2.) It was Dr. Wilson's opinion that she was "delusional and actively psychotic" at the time he saw her that day, that she then "presented a substantial danger to others," and that her case "presented a medical emergency" that warranted a five milligram dose of Haldol. *Id.* He noted her behavior, *i.e.*, that she "spit[ ] on people" and "appear[ed] delusional," in writing and diagnosed her condition as a

"probable psychotic illness," for which he prescribed that she be (1) evaluated for commitment to St. Elizabeths, (2) given five milligrams of Haldol by mouth or injection, and (3) be seen again the next day. *Id.;* Def. Exh. H (Consultation Sheet). Dr. Wilson stated that he recommended that she be administered Haldol even though he was aware she was refusing treatment at the time and that he still would have prescribed the drug even if he had been aware of the refusal of treatment form she signed earlier. Def. Exh. F. He also stated that it was his opinion that plaintiff was not competent to make a rational decision as to whether she should be given antipsychotic medication on that date. *Id.*

There is no dispute that she thereafter was taken, protesting and struggling, to the jail infirmary. She displayed a Christian Scientist book and screamed out statements to the effect that her religious rights were being violated, pleading for someone to call her attorney. In the infirmary she was strapped to a bed. She then was administered an injection of five milligrams of Haldol upon order of Dr. Smith. According to defendants, Dr. Smith did not direct that she be given the drug until after he had confirmed that Dr. Wilson had made the diagnosis and medical recommendation described above. He noted that he was concerned that without treatment plaintiff could have hurt herself. Def. Exh. J (Smith Report of Jun. 6, 1980). Plaintiff alleges that she suffered great "emotional and physical pain" as well as "great psychological and spiritual pain" as a result of the Haldol injection. In the opinion of the physicians and medical staff who observed the plaintiff, however, her condition improved substantially after she was administered Haldol.

The parties disagree as to precisely when on June 4, 1980 certain of plaintiff's acts took place. Defendants assert that she was spitting on people and behaving abusively before she was seen by a doctor; plaintiff, however, appears to contend that the spit-ting and abusive behavior began only when she was being taken forcibly to the infirmary. Moreover, plaintiff also denies that she was endangering her own life or the safety of others on June 4, 1980 and asserts that there was no "psychiatric emergency" with respect to her that day. Plaintiff also challenges defendants' position that administering Haldol would have been the only viable means of responding to the alleged psychiatric emergency, and avers that maintaining her in arm and leg restraints would have been an equally effective remedy which would not have infringed her constitutional rights.

I. *Plaintiff's Motion for Summary Judgment*

■■■ Because there is a dispute as to facts material to plaintiff's theory of relief, her motion for summary judgment cannot be granted. Fed.R.Civ.P. 56(c, d). ' For example, the constitutional rights she asserts were violated by the forcible administration of Haldol are not absolute, and must give way at least where such action is mandated by a compelling state interest: in this case, the need to protect the safety of others. *See Roe v. Wade,* 410 U.S. 113, 155–56, 93 S.Ct. 705, 727–28, 35 L.Ed.2d 147 (1973); *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *Rennie v. Klein,* 653 F.2d 836, 838 (3d Cir.1981), (*en banc*), *vacated on other grounds,* —— U.S. ——, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982); *Rogers v. Okin,* 634 F.2d 650, 654 (1st Cir.1980), *vacated on other grounds sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). Likewise, the fact of a medical emergency may vitiate any common-law claim for assault or battery arising from unconsented-to medical treatment. *See e.g., Dunham v. Wright,* 423 F.2d 940, 941–42 (3d Cir.1970). In the instant case, defendants assert that, contrary to plaintiff's view, the actions taken by them were in response to a medical emergency in which plaintiff presented a danger to others. This dispute alone there-

fore is sufficient to make summary judgment in favor of plaintiff inappropriate.

 A "compelling state interest" will justify actions of the type at issue in the instant case that infringe constitutional rights only where there is no reasonable alternative action that is less intrusive upon those rights. *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963), *Rennie v. Klein,* 653 F.2d at 845. Plaintiff asserts that a "less intrusive" means was available to defendants: they could simply have kept her in arm and leg restraints without drugging her. Defendants, however, argue that this method would not have been a reasonable alternative, noting that the restraints used at D.C. Jail are not foolproof and citing examples in the past where inmates were able to free themselves from those restraints, which are of a medically-approved type that the jail is compelled to use as a result of a court order in a previous case. The presence of this factual controversy also renders the Court unable to enter summary judgment for plaintiff.

Moreover, to the extent that plaintiff's claim is founded upon the alleged infringement of her first amendment right to the free exercise of her religion (which right is the focus of count I of her complaint and referenced specifically in counts II, IV, V, VI, and VII and implicitly in count III), a factual dispute precludes entry of summary judgment in that defendants contest whether her refusal of treatment was a result of her rational choice and religious beliefs or a product of "paranoid schizophrenia." Def. Mem. in Support of Def. Mot. at 8 n. 2. Accordingly, plaintiff's motion must be denied.

## II. *Defendants' Motion to Dismiss or for Summary Judgment*

Because defendants' motion also seeks dismissal of the complaint for failure to state a claim upon which relief can be granted, the necessity of exploring the threshold issue of the complaint's legal sufficiency means that the motion is not susceptible of such a brief disposition as is plaintiff's motion.

### A. The Legal Sufficiency of the Complaint

#### 1. Claims for Relief

Citing some recent appellate decisions addressing the right of mental patients to refuse antipsychotic drug therapy, defendants argue that of the five constitutional bases asserted by plaintiff to establish her claim of such a right, several of those are inapplicable to the instant situation. In counts I through V of her complaint, plaintiff alleges violations of the following constitutional rights: (1) her right under the Free Exercise clause of the first amendment to abstain from medical treatment in accordance with the tenets of her religion, (2) her right under the Due Process clauses of the fifth and fourteenth amendments not to be deprived of her liberty (to be free from bodily intrusion—*i.e.,* unwanted injections—and violations of her religious beliefs) without due process of law, (3) her right under the sixth amendment to the assistance of counsel at the time she was about to be injected with Haldol, (4) her right under the eighth amendment to be free from cruel and unusual punishment (*i.e.,* the physical and psychological pain she allegedly suffered as a result of the injection), and (5) her right to privacy under the ninth amendment. The Third Circuit in *Rennie v. Klein* and the First Circuit in *Rogers v. Okin* discussed from what constitutional sources the right to refuse treatment asserted in those cases could be derived.[1] In light of those decisions, defendants argue that the rights guaranteed by the sixth, eighth, and ninth amendments

1. Subsequent to the filing of the parties' initial motions, *Rogers* was vacated and remanded to the First Circuit in light of an intervening decision of the Supreme Judicial Court of Massachusetts concerning state law questions potentially dispositive of that case. *Mills v. Rogers,*

are not involved in this case, and that therefore counts III, IV, and V must be dismissed.

*Rogers v. Okin* involved the rights of voluntarily and involuntarily committed psychiatric patients at Massachusetts state mental health facilities to refuse to submit to the "serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs." 634 F.2d at 653. *Rennie v. Klein* concerned the same right as it applied to mentally ill persons involuntarily committed to New Jersey state mental institutions. 653 F.2d at 838. Nevertheless, the analyses in those cases of the source of the right to refuse such treatment is relevant to determining from where, if anywhere, the instant plaintiff's right (to the extent not claimed under the Free Exercise clause) is derived.

■ Both the *Rogers* court and the *Rennie* court concluded that the right arises from the Due Process clause applicable to states under the fourteenth amendment, the *Rennie* court rejecting arguments that the right may be found elsewhere in the Constitution.[2] In *Rogers,* the First Circuit said that although the precise textual source in the Constitution of the right is "unclear," "a source in the Due Process Clause of the Fourteenth Amendment for the protection of the interest exists, most likely as part of the penumbral right to privacy, bodily integrity, or personal security." 634 F.2d at 653 (citations omitted). The Third Circuit determined in *Rennie*

that the right to refuse treatment "implicates the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.'" 653 F.2d at 844, quoting *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). "This intrusion rises to the level of a liberty interest warranting the protection of the due process clause of the fourteenth amendment." 653 F.2d at 844. In so finding, the *Rennie* court specifically rejected the contention that compulsory antipsychotic medication implicates the eighth amendment's proscription on cruel and unusual punishment. *Id.*[3]

■ The court found the eighth amendment a "particularly inappropriate reference point," *id.,* noting that the provision is "directed to prevent excesses in the punishment of those who have been convicted of crime." *Id.* The fact that plaintiff was a prisoner in the custody of the Department of Corrections does not bring her injection with Haldol within the scope of the eighth amendment. Nothing in plaintiff's allegations or anywhere else in the records suggests that the administering of the drug was punishment rather than treatment. "After incarceration, only the 'unnecessary and wanton infliction of pain' [citations omitted] constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright,* 430 U.S. at 670, 97 S.Ct. at 1412 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), and *Gregg v. Geor-*

---

457 U.S. 291, 102 S.Ct. 2442, 2452, 73 L.Ed.2d 16 (1982). The Supreme Court did not discuss the analysis of *Rogers* relevant to the issues at hand. Thereafter, *Rennie* was vacated and remanded to the Third Circuit in a memorandum decision "for further consideration in light of *Youngberg v. Romeo,* [457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ]." *Rennie v. Klein,* —— U.S. ——, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982). *Youngberg* does not cast doubt upon any of the reasoning of *Rennie* referred to in this Memorandum Opinion, as that case does not discuss the right to refuse treatment. The reasoning in *Rogers* and *Rennie,* as far as this Court is concerned, remains persuasive as to the issues discussed herein.

**2.** Because the District of Columbia is not a "state" for purposes of the fourteenth amendment, the rights created by the Due Process clause apply to the District of Columbia directly by way of the fifth amendment.

**3.** The *Rennie* court also rejected the notion that the right had a source in the first amendment right to freedom of thought. 653 F.2d at 844. The *Rogers* court found it "unnecessary" to address that question. 634 F.2d at 654 n. 2.

*gia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). However painful the injection and its effects might have been, the record demonstrates that this was medical treatment and not "unnecessary and wanton infliction of pain" engaged in to punish. As such, count IV of the complaint shall be dismissed. Moreover, as this was an act of medical treatment and not a criminal proceeding, the sixth amendment right to counsel does not apply. U.S.Const. amend. VI ("In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence.") Count III therefore shall also be dismissed.

■ The ninth amendment provides that "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S.Const. amend. IX. The First Circuit in *Rogers,* as noted above, found that the privacy right implicated in the right to refuse drug treatment was a "penumbral right" derived from the Due Process clause. As that right is more properly found in the Due Process clause, the duplicative claim in count V shall be dismissed.

There is no serious dispute that plaintiff's complaint states legally sufficient claims under the Due Process clause of the fifth amendment and the Free Exercise clause of the first amendment for administering drug treatment against her will and against her professed religious beliefs. Accordingly, counts I and II of the complaint are not properly the subject of a motion to dismiss and are discussed in part II B, *infra,* in the context of defendants' alternative request for summary judgment.

### 2. Parties

■ As there is no doubt that Dr. Smith's actions were performed within the scope of his authority as Chief Medical Officer, he cannot be held personally liable for his actions that are the subject of this lawsuit. *Eskridge v. Jackson,* 401 A.2d 986, 989 n. 7 (D.C.1979). The complaint therefore

will be dismissed as to him in his individual capacity.

■ Defendants also assert that since none of the individually named defendants other than Dr. Smith are charged with any personal wrongdoing or even of having been aware of the events at issue in this action, none of these other defendants can be held liable in their official capacities. *Eskridge,* 401 A.2d at 989. Defendants also note that they not be held liable under a *respondeat superior* theory, inasmuch as they are not Dr. Smith's "masters," his "master" being his employer, the District of Columbia. *Carter v. Carlson,* 447 F.2d 358, 367 n. 24, 370 n. 39 (D.C.Cir.1971), *rev'd on other grounds sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). Yet under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), local officials may be sued in their official capacities under 42 U.S.C. § 1983 "where . . . the action alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [those] officers." 436 U.S. at 690, 98 S.Ct. at 2020. As Dr. Smith acted in accordance with an official policy governing the administering of medical treatment to inmates against their will, *see* Defendants' Answers to Plaintiff's Interrogatory No. 16, these other defendants are properly sued in their official capacities.

### 3. D.C.Code § 12–309

■ Section 12–309 of the District of Columbia Code provides that certain actions may not be maintained against the District of Columbia unless notice be given as specified in the statute within six months of the sustaining of injury or damage. This section is applicable to actions brought in federal court for deprivations of constitutional rights as well as to actions alleging common-law torts. *McClam v. Barry,* 697 F.2d 366 (D.C.Cir.1983). Accordingly, plaintiff's

failure to make such notice within the prescribed time period is a bar to maintaining this action against defendant District of Columbia. The action therefore will be dismissed in its entirety as to that defendant.

### B. Defendants' Request for Summary Judgment

### 1. The Constitutional Claims

The parties agree that plaintiff's rights under the Free Exercise and Due Process clauses to refuse drug therapy are not absolute. A review of the nature and extent of those rights is necessary to determine what circumstances will justify action by the state that otherwise would violate those rights.

The Second Circuit faced the issue of to what extent the state may constitutionally compel actions which violate an individual's religious beliefs in *Winters v. Miller,* 446 F.2d 65 (2d Cir.1971). That case bears some resemblance—but not identity—to the instant case, as it involved a mental patient and practicing Christian Scientist who, over her persistent objections on religious grounds, was given heavy doses of tranquilizers on a continuous basis during her commitment of approximately five weeks to state hospitals. The court noted the special nature of first amendment rights which "may not be infringed on such slender grounds [as other constitutional rights]. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943), *quoted in Winters,* 446 F.2d at 69.

The *Winters* court, upon reviewing various other cases where courts had held that a state's interest outweighed first amendment rights, concluded that only a "clear interest, either on the part of the society as a whole or at least in relation to a third party" would justify overriding a plaintiff's right under the Free Exercise clause. 446

F.2d at 70. Noting that there was "no evidence in the record that would indicate that in forcing the unwanted medication on Miss Winters the state was in any way protecting the interest of society or even any third party," the court determined that the state's police power did not warrant taking those actions which deprived plaintiff of her constitutional rights. *Id.* (The court also expressed some doubt as to whether she was in fact harmful to herself or others. *Id.*)

The holding of the Second Circuit in *Winters,* therefore, essentially is that absent some interest on behalf of society or a third party, the state police power cannot be invoked to impose a program of drug therapy on a person, when to do so would violate that person's Free Exercise rights. The court also rejected the argument that the state properly acted in a *parens patriae* capacity when it acted as it did. While the state's *parens patriae* power would justify overriding religious exercise rights to protect the interest of a child or an incompetent person, as the *Winters* plaintiff had not been adjudged incompetent the state could not presume to act in behalf of *her* best interests. *Id.* at 70–71.

In reaching its holdings, the court distinguished *Application of President and Directors of Georgetown College,* 331 F.2d 1000 (D.C.Cir.), *cert. denied,* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), in which Judge J. Skelly Wright issued an order permitting Georgetown Hospital physicians to administer blood transfusions to save the life of a dying patient refusing such treatment on the basis of her beliefs as a Jehovah's Witness. The patient was "*in extremis* and hardly *compos mentis* at the time in question; she was as little able competently to decide for herself as any child would be." 331 F.2d at 1008. This suggests a valid reason for the state to exercise the *parens patriae* power. Moreover, the interest of a third party was at stake: the patient's seven-month old child which "[t]he state, as *parens patriae,* will not allow a parent to abandon ...." *Id.*

What if the only interest at stake is the patient's life? That question was faced by the District of Columbia Court of Appeals in *In Re Osborne,* 294 A.2d 372 (D.C.1972). In that case a Jehovah's Witness was admitted to the hospital with injuries and internal bleeding caused when a tree fell on him. It was apparent to the attending physicians that the patient required a blood transfusion. The patient and his wife refused to give consent for the transfusion, on the basis of their religious beliefs which forbid infusion of whole blood into the body. The patient was lucid and not under the influence of drugs that could cause impairment of judgment or capacity for choice. He declared that although he did not wish to die, he believed that he would be deprived of the opportunity for "everlasting life" if transfusion were ordered. 294 A.2d at 373–74. Accordingly, the court found *Osborne* distinguishable from *United States v. George,* 239 F.Supp. 752 (D.Conn. 1965), wherein the patient, also a Jehovah's Witness, took the view that if forced to take a blood transfusion his conscience would be clear and the responsibility for the act would lie upon the court. 294 A.2d at 375 (quoting *George,* 239 F.Supp. at 753). The patient in that case stated that once the court entered an order permitting the transfusion, he would "in no way" resist the doctor's actions. *George,* 239 F.Supp. at 753. While George evidently only believed he would have done wrong by *consenting* to a transfusion, Osborne believed that he would be in the wrong under the tenets of his faith if the transfusion occurred at all.

The District of Columbia Court of Appeals affirmed the difficult decision to refuse to order the transfusion, since the trial court had "necessarily resolved the two critical questions presented—(1) has the patient validly and knowingly chosen this course for his life, and (2) is there [a] compelling state interest which justifies overriding that decision?" 294 A.2d at 375 (footnote omitted). Although this Court can only consider these matters in retrospect, nonetheless this test is an appropriate guide even here where contemporaneous appraisal of the situation is impossible.[4]

In the instant case, these questions cannot be resolved in a summary judgment posture. As noted above, defendants have raised a factual issue of plaintiff's competence on June 4, 1980 to make a rational decision as to whether she should be given psychotropic medication, asserting that her refusal of such treatment could well have been the result of paranoid schizophrenia. To prove that her refusal of drug therapy arose from her religious beliefs, it will not suffice for plaintiff to show simply that Christian Scientists are forbidden to receive such treatment—plaintiff must establish that at the time she was faced with that treatment she believed that she would run

---

4. Plaintiff seeks to minimize, unduly, the state's interest in protecting the life of a person who refuses medical treatment. She asserts that "[e]ven in an emergency situation, the government's interest in rendering treatment to preserve life to one who knowingly and validly refuses such treatment does not rise to the level of a 'compelling governmental interest' sufficient to justify overriding constitutionally protected rights of privacy, bodily integrity, and religious freedom." Pl. Mem. in Support of Pl. Mot. at 15. First of all, those rights derived from the Due Process clause alone may be overridden by less compelling grounds than necessary to justify infringement of Free Exercise clause rights. *Winters,* 446 F.2d at 69 (quoting *West Virginia State Board of Education v. Barnette*). Moreover, even where the rights of religious freedom are asserted, the state certainly maintains a very great interest in protecting the life of one of its residents. *See Georgetown College,* 331 F.2d at 1009 (noting state interest in prohibiting self-homicide; "Gordian knot of this suicide question"). Indeed, the *Osborne* court stressed the "unique" circumstances of that case which rendered the court "unable to conclude that judicial intervention respecting the wishes and religious beliefs of the patient was warranted under our law." 294 A.2d at 375. The state cannot lightly be made to relinquish its profound public interest in protecting the lives of its inhabitants. Where religious beliefs are offered as the bases for refusing essential, life-saving treatment, a strong showing of severe offense to those beliefs is necessary to overcome that interest of the state.

afoul of her own religious faith were she to allow (not just consent to) the injection of the drug.

Whether there was a "compelling state interest" justifying defendants' actions cannot be determined at this point either, inasmuch as there is a factual dispute as to the scope of the danger defendants assert as their reason for the injection. Defendants contend that plaintiff posed a danger not only to her own life and safety but the safety of others as well. Whether a reasonable, less intrusive alternative treatment was available (*i.e.,* keeping plaintiff in restraints until any danger had passed) is also disputed. The parties also disagree as to the immediacy of the asserted emergency. In resolving these issues some deference must be afforded to the findings of the professionals involved, Drs. Wilson and Smith. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (decision made by a professional is "presumptively valid"; liability imposed only when his decision is a "substantial departure from accepted professional judgment, practice or standards"), *see also Rogers,* 634 F.2d at 660 ("room must be left for responsible state officials to respond to exigencies that render totally impractical recourse to traditional forms of judicial process"); *Rennie,* 653 F.2d at 847 (noting need for expert medical and psychiatric opinion to determine questions of professional judgment).

■ Plaintiff's rights under the Due Process clause to refuse treatment likewise are not absolute. *Rennie,* 653 F.2d at 847 ("what is reviewable is whether the choice of a course of treatment strikes a proper balance between efficacy and intrusiveness"); *Rogers,* 634 F.2d at 654–61 (noting balancing of state police power and *parens patriae* interests against patient's constitutional rights). Accordingly, the factual disputes noted above concerning plaintiff's competency to decide to refuse treatment, the immediacy of the alleged emergency, the scope of the danger posed to plaintiff and others, and the availability of less restrictive alternatives render summary judgment as to plaintiff's claim under the Due Process clause improper as well.

### 2. Qualified Immunity

■ It is well established that governmental officials have qualified immunity from liability for damages under 42 U.S.C. § 1983 for discretionary acts performed in good faith. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). The immunity does not apply only where the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person]." *Id.* at 322, 95 S.Ct. at 1000. The immunity extends to subordinate officials not entitled to the absolute immunity enjoyed by high officials such as legislators, judges, and prosecutors; those subordinate officials include prison officials and officers. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

■ The purpose of the qualified immunity is to assure decision-makers that "action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." *Wood v. Strickland,* 402 U.S. at 321, 95 S.Ct. at 1000. As such, the scope of the protection afforded thereby will depend upon the "scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974).

■ The inquiry as to the official's good faith involves both an objective and a subjective test: "the existence of reasonable

grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief [that the action was proper] ...." *Id.* at 247–48, 94 S.Ct. at 1691–92. "[T]he matter is to be judged on the facts *as they appeared then* [at the time of the action], and not merely in the light of the event." *Moyer v. Peabody,* 212 U.S. 78, 85, 29 S.Ct. 235, 236, 53 L.Ed. 410 (1909), *quoted in Scheuer,* 416 U.S. at 248, 94 S.Ct. at 1692.

These questions cannot be resolved at this stage. As they depend upon the circumstances and motivations of the acts in question, matters in dispute, they await determination by the evidence adduced at trial. *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976). Whether defendants acted with malicious intent to deprive plaintiff of her constitutional rights is a fact to be established at trial. Likewise, what constitutional rights plaintiff validly asserted is a fact question to be resolved at trial. The nature and extent of those rights will, of course, depend upon the result of the inquiry referred to in the section above: did plaintiff make a valid choice to refuse treatment? Was such a choice founded upon religious rights (which may be more difficult to override than rights arising only from the Due Process clause)? Defendants' doubt that plaintiff's refusal of treatment was based on religious rights rather than paranoia could bear on the question of their good faith. Moreover, defendants' awareness of what governmental actions may constitutionally be taken in light of these various rights (or the extent to which defendants should have been aware of such constitutional limitations) is an issue relevant to this inquiry.

The circumstances of the asserted danger on June 4, 1980 will need to be developed at trial: how immediate was the danger? Who was endangered? To what extent were various people endangered? Was defendants' judgment in accordance with accepted professional standards? Because matters of professional judgment are at issue, expert testimony will be necessary in the inquiry as to such matters. *Youngberg v. Romeo,* 102 S.Ct. at 2462, 2462 n. 31.

### 3. Common-Law Claims

Because of the factual disputes already discussed herein, as noted in part I, above, plaintiff's claims for assault and battery cannot be resolved in favor of either side on a motion for summary judgment. Likewise, any assertion of immunity from damages arising from these claims on the ground that defendants acted in good faith and in accordance with accepted medical practices—assuming that District of Columbia law recognizes such an immunity—must depend upon the facts. *See Rogers,* 634 F.2d at 663 (noting that under Massachusetts law, principles of malpractice law rather than intentional tort theories such as assault and battery govern actions of doctors in state mental health facilities where doctors act in good faith). These issues remain for resolution at trial.

An order in accordance with the foregoing, denying plaintiff's motion for summary judgment and granting defendants' motion to dismiss or for summary judgment only to the extent that counts III, IV, and V of the complaint are dismissed and that the remainder of the complaint is dismissed as to defendant Dr. Smith in his individual capacity (but not as to him in his official capacity), the motion being denied in all other respects, will issue this date.