634 So.2d 681 (1994)
Jose RODRIGUEZ, M.D., and Barrio & Rodriguez, M.D., P.A., Appellants,
v.
Roberto PINO, as survivor and personal representative of the Estate of Albertina Berta Pino, Appellee.
Nos. 91-2119, 92-729.
District Court of Appeal of Florida, Third District.
March 8, 1994.
Rehearing Denied April 26, 1994.
*683 Stephens, Lynn, Klein & McNicholas and Philip D. Parrish, Miami, for appellants.
Keith Chasin, Miami, for appellee.
Before SCHWARTZ, C.J., and BARKDULL and LEVY, JJ.
SCHWARTZ, Chief Judge.
Dr. Jose Rodriguez and his P.A. appeal from a final judgment entered on a jury verdict against him in a medical malpractice action for the wrongful death of Berta Pino.[1] Mrs. Pino died as a result of respiratory failure on July 24, 1987. Her breathing tube[2] became dislodged that day and she and Mr. Pino refused, for more than four hours, to allow the medical personnel to reinsert it. After she finally consented to the re-intubation, an emergency room physician performed the procedure. Several minutes later, however, Mrs. Pino "coded," and she was pronounced dead at 6:30 a.m. The plaintiff argues, and the jury apparently agreed, that Dr. Rodriguez should have gone to the hospital and re-intubated Mrs. Pino despite her and her husband's wishes. We reverse and hold that Dr. Rodriguez is not liable as a matter of law for Mrs. Pino's death because both she and her husband were competent and did not consent to the procedure Dr. Rodriguez allegedly should have performed.

I.
Mrs. Pino entered the hospital for open heart surgery, which was performed on July 14. During the procedure she was attached to a respirator. Dr. Rodriguez was called in as treating pulmonologist after the surgery. He ordered the tube removed because her arterial blood gases were satisfactory. Mrs. Pino breathed without the tube from July 15 through July 18. On the 18th, however, Mrs. Pino's cardiologist discovered that she had an accumulation of fluid in her lungs. This problem was diagnosed as Adult Respiratory Disease Syndrome (ARDS). As a result, Mrs. Pino was re-intubated.
On July 20 at approximately 8:00 a.m., the tube became dislodged. The hospital staff notified Dr. Rodriguez that Mrs. Pino's blood gas level was low. He ordered a blood gas test and stated that she was to be re-intubated if her blood gas level fell below 60. In the meantime, Mrs. Pino was refusing to allow reinsertion of the tube. Dr. Barrio, Dr. Rodriguez's partner, and other doctors, including Mrs. Pino's family physician and her cardiologist, tried to convince her to do so. She adamantly refused despite being told of the possible consequences of attempting to breathe without the tube. Dr. Rodriguez and Dr. Barrio discussed the situation and felt that there was nothing else they could do. At noon on the 20th, Mrs. Pino agreed to be re-intubated.
Four days later, at approximately 12:40 a.m., the tube became dislodged again. And, again, Mrs. Pino refused to be re-intubated. At 1:30 a.m., the hospital staff informed Dr. Rodriguez, who was not at the hospital, that Mrs. Pino's tube was out. He was told that she was placed on a non-rebreathing mask and was refusing to be re-intubated. Dr. Rodriguez ordered re-intubation and a blood gas study. He discussed with the nurse that Mrs. Pino seemed to be competent  she was awake, alert, oriented, and asking appropriate questions  but was simply refusing re-intubation just as she had done four days earlier.
Mr. Pino arrived at the hospital on the 24th shortly after the extubation and stayed with Mrs. Pino for the remainder of the morning. During that time, numerous medical personnel informed both Mr. and Mrs. Pino that she needed to be re-intubated, Dr. *684 Rodriguez had ordered re-intubation, and that she risked death by remaining without the tube. At one point, Mr. Pino stated that Mrs. Pino would be the one to make the decision regarding re-intubation. Mrs. Pino reported feeling better on the non-rebreathing mask and, in response to the nurses' pleas, said that she wanted to rest a while before the tube was reinserted. She even indicated that she would agree to be re-intubated later in the morning. Mrs. Pino's blood gas level increased dramatically between 2:00 a.m. and 3:00 a.m., presumably because she was moved from her bed to a chair to help improve her breathing. At 4:00 a.m., Mrs. Pino herself asked for another blood gas study.
At 3:00 a.m., Dr. Rodriguez called the hospital to inquire as to Mrs. Pino's condition. Mrs. Pino's blood gas level was 70 at that time, which suggested adequate oxygenation, however, Dr. Rodriguez instructed the nurse to continue trying to persuade Mrs. Pino to consent to re-intubation. Dr. Rodriguez called the hospital one more time at 5:00 a.m. and was informed that Mrs. Pino had finally consented to be re-intubated. Dr. Holland, the emergency room physician on duty at the time, was paged at 5:18 a.m., and he performed the procedure at 5:21 a.m. Unfortunately, however, Mrs. Pino died from lack of oxygen at 6:30 a.m. The hospital staff did not call Dr. Rodriguez when Mrs. Pino "coded." Instead, the physician who responded to the code notified Dr. Rodriguez later that morning that Mrs. Pino had died.
At trial, it was established that Dr. Rodriguez would not have performed the re-intubation even if he had gone to the hospital that morning. Nurse McKay, one of the ICU nurses who cared for Mrs. Pino throughout the morning, testified that patients' breathing tubes frequently become dislodged and the emergency room physician would have been called to perform the re-intubation the moment Mrs. Pino provided consent. The appellee's experts agreed that an emergency room physician would probably perform the re-intubation. Nevertheless, they stated that Dr. Rodriguez's conduct fell below the standard of care because: (1) Mrs. Pino was not competent to refuse intubation; (2) the situation was an emergency and Mrs. Pino's consent was therefore implied; (3) Dr. Rodriguez had a duty to re-intubate Mrs. Pino; (4) Dr. Rodriguez should have gone to Mrs. Pino's bedside to assess her competency instead of relying on the nurses to make that determination; and (5) a timely intubation would have saved Mrs. Pino's life.
The jury returned a verdict against Dr. Rodriguez and the hospital and awarded damages, for which the hospital was 45 percent liable and Dr. Rodriguez was 55 percent liable, of more than $1,000,000. The jury found that Mrs. Pino refused to be re-intubated but that she was not competent to make the decision. On the other hand, the jury found that Mr. Pino was competent on the morning of the 24th and that he agreed that the intubation decision was up to his wife.[3],[4]

*685 II.
We agree with Dr. Rodriguez that the trial court should have stricken the plaintiff's experts' testimony and directed a verdict in his favor because the evidence fails to show either that Mrs. Pino was incompetent to refuse re-intubation or that the extubation constituted an "emergency" as defined by the law.
If Mrs. Pino were competent on the 24th, Dr. Rodriguez could not, as a matter of law, be liable for failing to re-intubate her. This is because a competent individual has the categorical authority to refuse even lifesaving medical treatment. In re Dubreuil, 629 So.2d 819, 822 (Fla. 1993) ("[A]rticle I, section 23 of the Florida Constitution guarantees that `a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one's health.'") (quoting In re Guardianship of Browning, 568 So.2d 4, 11 (Fla. 1990)); see Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989); Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), aff'd, 379 So.2d 359 (Fla. 1980). Indeed, a physician who treats a patient despite such a refusal is civilly (and criminally) liable for assault and battery. Chambers v. Nottebaum, 96 So.2d 716, 718 (Fla. 3d DCA 1957); see Dubreuil, 629 So.2d at 823-24 ("When a health care provider, acting in good faith, follows the wishes of a competent and informed patient to refuse medical treatment, the health care provider is acting appropriately and cannot be subjected to civil or criminal liability."). We hold, as a matter of law, that Mrs. Pino was indeed competent at the decisive time.
An approach to the issue of the decedent's competence begins with the proposition that a person is presumed to be competent unless the evidence shows otherwise. Campbell v. Stoner, 249 So.2d 474, 476 (Fla. 3d DCA 1971), cert. denied, 254 So.2d 361 (Fla. 1971); 29 Fla.Jur.2d Incompetent Persons § 168 (1981); see Lane v. Candura, 6 Mass. App. 377, 376 N.E.2d 1232, 1235 (1978) (evidence failed to show that patient incapable of appreciating the nature and consequences of her act); Grannum v. Berard, 70 Wash.2d 304, 422 P.2d 812, 814 (1967) ("law will presume ... competency rather than incompetency") (citation omitted); see also In re Romero, 790 P.2d 819, 822 (Colo. 1990) (en banc) (holding that, since constitutional rights are implicated when one seeks to treat a patient against his will, presumption rebutted only by clear and convincing evidence that the individual is incompetent to make a decision regarding treatment); Grannum, 422 P.2d at 814 ("[T]he standard of proof required to overcome this presumption, in civil cases, is that of clear, cogent and convincing evidence.") (citations omitted).
In attempting to overcome this presumption, the appellee produced two medical experts. The substance of their opinions was simply that Mrs. Pino must have been incompetent on the 24th because she was acutely ill, in intensive care, on medication, sleep deprived, and hypoxemic. The first expert, Dr. Bone, said that while extubated, "she can't make good decisions at that time, and what you have is a medical emergency so you [re-intubate]." The second, Dr. Gallagher, suggested that, "taking all these facts [Mrs. Pino was] in no position to judge appropriate therapy for [herself] and make a rational decision."
This testimony does not constitute "competent," substantial evidence that Mrs. Pino was incompetent. Obviously, a patient may not be deemed incompetent simply because his decision is not a medically appropriate one. For example, the court in Lane *686 stated that the patient's refusal to consent to amputation of her gangrenous leg did not itself justify a conclusion that she was incompetent. "[T]he irrationality of her decision does not justify a conclusion that Mrs. Candura is incompetent in the legal sense. The law protects her right to make her own decision... whether that decision is wise or unwise." Lane, 376 N.E.2d at 1235-36; see Romero, 790 P.2d at 823 ("The fact that a court finds the decision ... to be unreasonable is not enough to find the individual incompetent.") (citations omitted).
More importantly, the factors upon which the experts based their opinions do not in any way demonstrate incompetence. Dr. Bone was not able to determine whether the medications actually affected Mrs. Pino's ability to understand the nature of her condition and the consequences of her refusal to be re-intubated. He merely assumed that they did. It follows, therefore, that the experts could only assume further that sleep deprivation and hypoxemia affected Mrs. Pino's competency.[5]
On the contrary, the undisputed direct evidence shows that during the entire period Mrs. Pino was extubated, she was awake, alert, oriented, and asking appropriate questions. As we have seen, at one point in the morning, she herself asked for a blood gas study to be performed. Most important, she was informed of and understood the risk of death if the tube were not timely reinserted. Ultimately, presumably competent at that time, she consented to the procedure. The evidence thus uncontradictedly supports the unanimous view of the various medical personnel who actually treated Mrs. Pino on the 24th that she was competent  that is, that she fully understood the consequences of non-intubation and deliberately chose to risk them.[6]
It is clear, then, that Dr. Bone's and Dr. Gallagher's opinions regarding Mrs. Pino's competency amount to mere speculation. Expert testimony of this kind may not be given weight. See Iden v. Kasden, 609 So.2d 54, 57 (Fla. 3d DCA 1992) ("expert witness' opinion based on facts or inferences not supported by evidence has no evidentiary value; the opinion cannot constitute proof of the existence of facts necessary to support the opinion") (citing Arkin Constr. Co. v. Simpkins, 99 So.2d 557 (Fla. 1957)), review denied, 620 So.2d 761 (Fla. 1993).
But the appellee's experts went one step further. They agreed that a physician cannot treat a patient against the patient's competent will. Yet they claimed  contrary to the law  that Mrs. Pino's extubation was a medical emergency that allowed a physician to intubate without having to assess her competency.[7] *687 Thus, Dr. Bone analogized Mrs. Pino's extubation to a situation where a patient needs CPR. From this, the appellee argues that Mrs. Pino's consent for treatment was implied under the circumstances. This is wrong.
As we have seen, a competent individual who needs immediate, lifesaving treatment has the right to refuse it.[8] And the legal definition of an "emergency," as established in Chambers v. Nottebaum, 96 So.2d 716 (Fla. 3d DCA 1957) and which we are bound to follow, is one in which the situation calls for immediate medical treatment and it is not feasible to obtain consent from one legally permitted to provide it. Chambers, 96 So.2d at 718 (rule requiring consent qualified in an emergency where immediate action is necessary and it is impracticable to first obtain consent) (citation omitted); see Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 105 N.E. 92, 93 (1914) ("[A] surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages[,]... except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained.") (citations omitted), overruled on other grounds, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957). Only when this latter situation exists is a patient's consent for treatment implied. It did not exist here.
For the same reason, the appellee's reliance on Metropolitan Dade County v. P.L. Dodge Foundations, Inc., 509 So.2d 1170 (Fla. 3d DCA 1987) for the propositions that there is no battery when a physician treats an incompetent patient in an emergency,[9] Appellee's Answer Brief at 27, and that Dr. Rodriguez could have re-intubated Mrs. Pino with or without her consent, Appellee's Answer Brief at 31, is totally misplaced. The language in P.L. Dodge  that
one [who] supplies services to a mentally impaired person, even though acting without his knowledge or consent, ... is entitled to restitution
"if he acted unofficiously and with intent to charge therefore, and the things or services were necessary to prevent the other from suffering serious bodily harm or pain, and the person supplying them had no reason to know that the other would not consent to receiving them, if mentally competent, and... because of ... mental impairment, the other's consent would have been immaterial"
509 So.2d at 1172 (citations omitted)  is not inconsistent with Chambers. This language means only, as Chambers requires before consent is implied, that it is impracticable to obtain consent. Moreover, P.L. Dodge primarily involved a hospital's right to receive payment for services rendered to a prisoner; it surely does not suggest that Dr. Rodriguez could have treated Mrs. Pino without her consent.
In this case, there was no Chambers emergency that gave rise to Mrs. Pino's implied *688 consent. The evidence shows that after Mrs. Pino became extubated, she was placed on a non-rebreathing mask and received high levels of oxygen, her blood gas level improved, and she even reported feeling better. Her condition improved further after she was moved from her bed to a chair. But she continued to refuse re-intubation. Although it is certainly true that her best chance of recovery would have been to have the tube reinserted, her adamant, competent refusal to consent precludes the implication of the direct contrary  that she did.[10]

III.
Even if Mrs. Pino were incompetent, as she was not, the action is barred by the refusal of her husband, who was at her bedside during the morning of the 24th, to consent. The right to refuse medical treatment is not lost even when a person becomes incompetent. Browning, 568 So.2d at 12 ("[T]he right of privacy would be an empty right were it not to extend to competent and incompetent persons alike.") (citation omitted); Corbett v. D'Alessandro, 487 So.2d 368, 370 (Fla. 2d DCA 1986) (right of privacy found in article I, section 23 of the Florida Constitution "extends to incompetent persons") (citation omitted), review denied, 492 So.2d 1331 (Fla. 1986). The authority then passes to the putative incompetent's next of kin, here, Mr. Pino. Browning, 568 So.2d at 13 (incompetent's right to refuse medical treatment "may be exercised by ... surrogates such as close family members or friends"). Here, the jury found that Mr. Pino, who was himself competent, had left the intubation decision entirely to his wife. Because the procedures outlined in Browning[11] were fully satisfied, his refusal to consent therefore also requires reversal.

IV.
Mrs. Pino's unfortunate passing resulted solely from her persistent refusal to be re-intubated and Mr. Pino's refusal to consent to it on her behalf. As the supreme court stated in Dubreuil, "[w]hen a health care provider, acting in good faith, follows the wishes of a competent and informed patient [or her surrogate] to refuse medical treatment, the health care provider is acting appropriately and cannot be subjected to civil... liability." Dubreuil, 629 So.2d at 823-24 [e.s.]. There is no evidence of anything other than good faith on the part of Dr. Rodriguez and all the medical personnel who cared for Mrs. Pino on July 24.
In sum, the verdict against Dr. Rodriguez was a genuine injustice. He simply cannot be held liable for failing to do what he would have inevitably been held liable for doing  treating a competent patient against her and her competent surrogate's objections. The judgments below are therefore reversed with directions to enter one for Dr. Rodriguez.
Reversed.
NOTES
[1] The jury also found against the AMI/Kendall Regional Medical Center, but the hospital settled after the verdict and is not involved in this appeal. Another defendant, Dr. Cuello, the family physician, won a verdict in his favor.
[2] The tube is part of a ventilator or respirator and is inserted into the throat through either the nose or the mouth, enabling air to be pushed into the lungs. The tube is uncomfortable and its insertion is an invasive procedure.
[3] The verdict was as follows:

1. Was there negligence on the part of AMI KENDALL REGIONAL MEDICAL CENTER, INC. which was a legal cause of the death of BERTA PINO?
 YES X NO ______
2. Was there negligence on the part of JOSE RODRIGUEZ, M.D. which was a legal cause of the death of BERTA PINO?
 YES X NO ______
3. Was there negligence on the part of FRANCISCO CUELLO, M.D. which was a legal cause of the death of BERTA PINO?
 YES ______ NO X 
4. Was there negligence on the part of BERTA PINO which was a legal cause of her death?
 YES ______ NO X 
5. Was there negligence on the part of ROBERTO PINO, SR. which was a legal cause of the death of BERTA PINO?
 YES ______ NO X 
6. Was BERTA PINO competent on the morning of July 24, 1987?
 YES ______ NO X 
7. Was ROBERTO PINO, SR. competent on the morning of July 24, 1987?
 YES X NO ______
8. Did BERTA PINO refuse intubation between 12:40 A.M. and 5:00 A.M. on the morning of July 24, 1987?
 YES X NO ______
9. Did ROBERTO PINO, SR. agree with BERTA PINO'S decision to refuse intubation on the morning of July 24, 1987?
 YES X NO ______
10. State the percentages of negligence that you charge to:

 AMI KENDALL REGIONAL
 MEDICAL CENTER 45%
 JOSE RODRIGUEZ, M.D. 55%
 FRANCISCO CUELLO, M.D. -0-%
 BERTA PINO -0-%
 ROBERTO PINO, SR. -0-%
 TOTAL MUST EQUAL 100% 100%

[4] Pursuant to section 768.79, Florida Statutes (1989), the appellee made a pretrial demand for judgment in the amount of $250,000. The appellants rejected this demand and now also appeal a final cost judgment awarding attorney's fees under the statute. Because we reverse on the merits in this case, the final cost judgment is also reversed.
[5] The court in Lane was faced with a similar situation. There, a psychiatrist testified that the patient's ability to make a medically rational choice was impaired because she was confused. In holding that the evidence failed to show that Mrs. Candura was incompetent, the court stated:

What is lacking in this case is evidence that Mrs. Candura's areas of forgetfulness and confusion cause, or relate in any way to, impairment of her ability to understand that in rejecting the amputation she is, in effect, choosing death over life.
Lane v. Candura, 6 Mass. App. 377, 376 N.E.2d 1232, 1236 (1978) [e.s.].
[6] Florida cases have found similar evidence highly persuasive in demonstrating competency in other contexts. See, e.g., Durocher v. Singletary, 623 So.2d 482, 484 (Fla. 1993) (Death row inmate "presents every indication that he is knowingly, intelligently, and voluntarily waiving his right to collateral proceedings through his adamant refusal to allow CCR to represent him.") (footnote omitted); Republic Nat'l Bank v. Johnson, 622 So.2d 1015 (Fla. 3d DCA 1993) (Under U.C.C., bank had no duty to inquire into customer's competency. Therefore, the bank is not liable to incompetent customer's guardian for large sums provided to the customer from the customer's own account. The bank was not aware of the adjudication of incompetence until after the transactions, there was no evidence of customer's demeanor at the time of the transactions, and customer appeared lucid and able to understand her actions on a separate occasion.); Coley v. State, 616 So.2d 1017 (Fla. 3d DCA 1993) (no evidence, in sexual battery case, which would support a finding that victim was physically helpless to resist where she was neither asleep nor unconscious and able to communicate at all relevant times); Coppock v. Carlson, 547 So.2d 946 (Fla. 3d DCA 1989) (no showing that decedent lacked testamentary capacity; despite age and delusions about his physical prowess, evidence more relevant to question of capacity was that decedent kept appointment with attorney, properly executed new will, and appeared of strong mind), review denied, 558 So.2d 17 (Fla. 1990).
[7] The experts' testimony should have also been excluded on the basis that it was legally mistaken. See Federated Dep't Stores, Inc. v. Doe, 454 So.2d 10, 12 (Fla. 3d DCA 1984) ("An expert's opinion, if based upon an erroneous concept of law, is equally devoid of competency.") (citing Stubbs v. State Dep't of Transp., 332 So.2d 155 (Fla. 1st DCA 1976)).
[8] See, e.g., In re Dubreuil, 629 So.2d 819 (Fla. 1993); Wons v. Public Health Trust, 500 So.2d 679 (Fla. 3d DCA 1987), aff'd, 541 So.2d 96 (Fla. 1989); St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985).
[9] The appellee also cites to Osgood v. District of Columbia, 567 F. Supp. 1026 (D.D.C. 1983) as support for this proposition. Osgood contains only a passing reference to this principle: "[T]he fact of a medical emergency may vitiate any common-law claim for assault or battery arising from unconsented-to medical treatment." Osgood, 567 F. Supp. at 1030 (citation omitted). This statement, even as far as it goes, conflicts with Chambers v. Nottebaum, 96 So.2d 716 (Fla. 3d DCA 1957). Applying the rule in Chambers to the facts of Osgood also demonstrates that Osgood is not dispositive of the issues in the present case; there is no indication from the facts in Osgood that it was impracticable to obtain consent on behalf of the patient from someone legally authorized to provide such consent. Also, the patient in Osgood was confined to a detention facility, and institutional considerations, such as the safety of personnel and other inmates, may play a part in determining whether it was impracticable to obtain consent. Finally, since Osgood was decided at the summary judgment stage, the immediacy of the alleged emergency was never established.
[10] We have been unable to find a single case on remotely similar facts in which a finding of incompetency to consent has been sustained. See Elyn R. Saks, Competency to Refuse Treatment, 69 N.C.L.REV. 945 (1991), and cases collected.
[11] A surrogate may refuse treatment on behalf of the incompetent only when: (1) the patient has orally declared or executed a document evidencing her intent to have future medical care withheld; (2) the patient does not have a reasonable probability of recovering competency so that the right of terminating or withholding treatment could be exercised directly by the patient; and (3) any limitations, expressed either orally or in the written declaration, have been carefully considered and satisfied. In re Guardianship of Browning, 568 So.2d 4, 15 (Fla. 1990).