# Third District Court of Appeal

## State of Florida

Opinion filed January 17, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-600
Lower Tribunal No. 13-21696
_____

**Robert Siegel, etc.,**
Appellant,

vs.

**Cross Senior Care, Inc., et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Michael A. Hanzman, Judge.

Eaton & Wolk, PL, and Douglas F. Eaton, for appellant.

Fuerst Ittleman David & Joseph, PL, and Christopher M. David, Michael B. Kornhauser, and Jeffrey J. Molinaro, for appellees.

Before LOGUE, SCALES, and LUCK, JJ.

LOGUE, J.

At the age of 88, Sybil Siegel died at Mount Sinai Medical Center of end stage dementia and end stage chronic obstructive pulmonary disease. Robert Siegel, her son, sued Cross Gardens Care Center, LLC and several of its administrators. Cross Gardens operated the nursing facility where Ms. Siegel resided before admission to Mt. Sinai. In closing argument, Siegel asked the jury for $400,000 for pain and suffering and $90,161.86 in medical and funeral expenses. The jury entered a verdict for Siegel but awarded only $5000 in medical expenses and $1133 for funeral expenses. The trial court set aside this award and entered a judgment notwithstanding the verdict. Siegel appealed.

We affirm on all grounds and write only to address the court's decision to set aside the verdict. At trial, Siegel's theory rested almost entirely on the testimony of Dr. Lee Fisher, an expert in family medicine. Dr. Fisher never treated or examined Ms. Siegel. His opinions were based exclusively on his review of Ms. Siegel's medical records. However, his major opinions were contradicted by the medical records upon which they were purportedly based. The question presented on appeal is whether Dr. Fisher's opinions had sufficient evidentiary weight to be submitted to the jury. The trial court found that they did not. We agree.

## Facts

Because the issue is the sufficiency of Dr. Fisher's opinions, we first provide Dr. Fisher's opinion and then review the medical evidence. Dr. Fisher's opinion

2

focused on what he perceived as Ms. Siegel's lack of care in the nursing home prior to her transfer to Mt. Sinai. In particular, his opinion was based on the lack of entries in Ms. Siegel's nursing notes from February 10, 2013, when her condition was noted as stable, to February 25, 2013, when she was transferred to Mt. Sinai with pneumonia.

Focusing on this fourteen-day "gap" in the nursing notes, Dr. Fisher offered an opinion as follows: (1) during the fourteen-day gap, Ms. Siegel was not being properly monitored at the nursing home; (2) during the fourteen-day gap, Ms. Siegel's pneumonia flared up essentially unnoticed; (3) on February 21, 2013, Ms. Siegel's pneumonia reached a critical phase; (4) if Ms. Siegel had been monitored and if the nurse's notes had included the entries reflecting Ms. Siegel's worsening pneumonia, Ms. Siegel would have been transferred to Mt. Sinai on February 21, 2013, rather than February 25, 2013; (5) if Ms. Siegel had been transferred to Mt. Sinai on February 21, 2013, she would have recovered; (6) if she had recovered, Ms. Siegel would have lived another three years because she had been repeatedly hospitalized for pneumonia and other illnesses in the prior decades and she had always recovered; and (7) Ms. Siegel died of pneumonia.

The evidence showed that, in 1995, Ms. Siegel was debilitated by a stroke. After the stroke, she required assistance for everyday functions such as eating, dressing, bathing, and using the bathroom. Since as far back as 2005, Ms. Siegel

3

had suffered from various maladies including urinary tract infections and a feeding tube infection. She had been hospitalized for pneumonia in January 2005, May 2005, June 2005, April 2007, August 2010, and July 2012. In 2012 alone, she suffered from urosepsis, septicemia, a urinary tract infection, an E. Coli infection, and two instances of pneumonia.

Ms. Siegel resided at the nursing home at issue for seventeen years. The Defendant, Cross Gardens, operated the facility during the last six months of Ms. Siegel's stay, from September 2012 through February 2013. At the time Cross Gardens took over the facility, Ms. Siegel was already suffering from dementia and chronic obstructive pulmonary disease, among other illnesses. All parties agreed that Cross Gardens did not cause Ms. Siegel to have these illnesses.

Cross Garden's nursing notes for Ms. Siegel on February 10, 2013 indicated her condition was stable. There were no other entries in the nursing notes until February 25, 2013, when she was transferred to Mt. Sinai with pneumonia.

While there were no other nursing notes during this period, there were other medical records. During the "gap" period, Cross Garden's records show that nurses screened Ms. Siegel for pain three times a day every day. In addition, the records show that on February 11, 2013, she was x-rayed. On February 12, 2013, her blood was drawn and tested (white blood cells elevated indicating possible infection). On

February 15, 2013, she was seen by Dr. Suarez who prescribed Nuedexta, which moderates extreme mood changes like sudden laughing and crying.

On February 21, 2013, she was again x-rayed. Among other things, the x-ray showed no evidence of pneumonitis. Pneumonitis is inflammation of the lung tissue from all causes. A subcategory of Pneumonitis is pneumonia in which the inflammation is caused by infection. The x-ray indicated that Ms. Siegel did not have "consolidation" which, as Dr. Fisher himself testified, is what the x-ray would have shown if Ms. Siegel had pneumonia on February 21, 2017. Dr. Fisher agreed the February 21, 2013 x-ray "ruled out pneumonia."

On February 22, 2013, Ms. Siegel was examined and all of her vital signs were within normal ranges. On February 19, 20, 21, 22, 23, and 24, 2013, her respiratory condition was examined twice a day and was within normal ranges.

On February 25, 2013, the medical records indicated she was in distress and having trouble breathing in the morning. Her condition fluctuated during the day. A doctor was summoned around noon and the decision was made to transfer her to Mt. Sinai, where she was admitted that evening suffering from a urinary tract infection and pneumonia.

On March 2, 2013, Mt. Sinai records indicated her "pneumonia clinically improving." On March 6, 2013, an advanced x-ray at Mt. Sinai revealed Ms. Siegel's condition was "not particularly impressive for pneumonia."

5

On March 18, 2013, Ms. Siegel died in the hospital. The death certificate listed the cause of her death as end stage dementia and end stage chronic obstructive pulmonary disease.

As mentioned above, in closing Siegel asked for approximately $500,000 and the jury awarded him approximately $6000. After the verdict, Siegel moved for new trial or additur and Cross Care moved for a judgment notwithstanding the verdict. The trial court denied the motions for new trial and additur and granted the judgment notwithstanding the verdict. In doing so, he commented:

> This case, in the Court's view, is built on a total house of cards. . . . [T]he opinion of this doctor is pure ipse dixit; it was unsupported by anything. And . . . there's no evidence she would have recovered if she had gotten to Mount Sinai three days earlier.

This appeal followed.

## Analysis

"In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." <u>Gooding v. University Hospital Bldg., Inc.</u>, 445 So. 2d 1015, 1017 (Fla. 1984). The burden was therefore on Siegel as the plaintiff to establish that the defendant's negligence caused Ms. Siegel's death. To meet this burden, Mr. Siegel could not rely on conjecture or simply prove that causation was

6

possible. The plaintiff must carry the affirmative burden of proving causation was more likely than not:

> On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. <u>A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.</u>

<u>Id. at 1018</u> (citation omitted) (emphasis added).

An examination of Dr. Fisher's opinions indicate that, time and again, he drew inferences from the medical records that were not more-likely-than-not. Indeed, at critical points, his opinions are directly contradicted by the very medical records upon which they are purportedly based.

The one hard fact on which Dr. Fisher's opinions are based is that there were no entries in the nurse's notes from February 10, 2013 to February 25, 2013. This "gap" was undisputed. From this "gap," however, Dr. Fisher draws the inference that the nurses were not monitoring Ms. Siegel's condition. The problem with this inference is that it is contradicted by the raft of medical reports indicating that Ms. Siegel's condition was being constantly monitored, recorded, and reported throughout that period. During the two week "gap" period, she was screened for pain three times a day. She was x-rayed twice. Her blood was drawn and tested.

7

She was prescribed and given a new drug. Her vital signs were repeatedly taken and recorded. When a breathing problem occurred (on February 25, 2013), the fact was immediately recorded, she was monitored all day, and a doctor was summoned. Dr. Fisher's inference that the "gap" in the notes signified that she was not monitored is worse than speculation: it is contradicted by the only evidence Dr. Fisher or the jury had.

Dr. Fisher's first opinion in his theory of liability, therefore, runs afoul of the holding of a legion of cases like Rodriguez v. Pino, 634 So. 2d 681, 686 (Fla. 3d DCA 1994) (quoting Iden v. Kasden, 609 So. 2d 54, 57 (Fla. 3d DCA 1992)) that an "'expert witness' opinion based on facts or inferences not supported by evidence has no evidentiary value; the opinion cannot constitute proof of the existence of facts necessary to support the opinion." See, e.g., Arkin Construction Co. v. Simpkins, 99 So. 2d 557, 561 (Fla. 1957) ("It is elementary that the conclusion or opinion of an expert witness based on facts or inferences not supported by the evidence in a cause has no evidential value.").

The same is true for Dr. Fisher's next opinion that Ms. Siegel had pneumonia on February 21, 2013, which Dr. Fisher opined was so critical that the failure to hospitalize her on that day ultimately caused her death by pneumonia. As he himself admitted on cross-examination, an x-ray taken that same day "ruled out pneumonia." The x-ray ruled out pneumonia, he explained, because it did not show

"consolidation" which would have appeared if Ms. Siegel had pneumonia that day. In fact, as he admitted, a medical examination the next day showed all of her vital signs within normal ranges. The results of this examination cannot be reconciled with his opinion she was dying of pneumonia. When asked to explain how the vital signs were normal when Dr. Fisher's theory was that she was purportedly dying of pneumonia, he responded, "I don't know."

When the actual x-rays and examinations, as Dr. Fisher himself admitted, "rule out pneumonia" on February 21, 2017, Dr. Fisher's contradictory inference that the patient had pneumonia on February 21, 2017 is entitled to no evidentiary weight. To support his opinion in this regard, Dr. Fisher would have had to provide a fact-based chain of reasoning based on some other medical record or evidence. He did not do so. Once again, his opinion is flatly contradicted by the medical records which provide the sole basis for his opinion. And, once again, Dr. Fisher's opinion on this point falls directly under the holding of Rodriguez that an "'expert witness' opinion based on facts or inferences not supported by evidence has no evidentiary value." 634 So. 2d at 686.

Also problematic in this regard is Dr. Fisher's next opinion that Ms. Siegel could have recovered and lived for three years if she had been admitted to the hospital on February 21, 2013 rather than February 25, 2013. In support of this opinion, he referred to the fact that she had previously been hospitalized for

pneumonia and survived. This is a total non sequitur. It does not follow that because a person was admitted with pneumonia at age 60, 70, or 80 and survived that she will necessarily survive if she is admitted with pneumonia at age 88. The patient's chance of survival will turn on an analysis of much more specific factors including the severity of the pneumonia and the underlying physical condition of the patient. Dr. Fisher does not begin to undertake such a specific analysis. His facile explanation is too "conclusory in nature and . . . unsupported by any discernible, factually-based chain of underlying reasoning." Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Gonzalez, 98 So. 3d 1198, 1202 (Fla. 3d DCA 2012) (citation omitted). The same is true of his pronouncement that she would have lived a further three years. Both opinions, therefore, can be afforded "no weight." Id. His opinions are, as the trial court properly characterized them, "pure ipse dixit."

Finally, Dr. Fisher's entire theory is based on his opinion that Ms. Siegel died of pneumonia. While Ms. Siegel was admitted to Mt. Sinai with pneumonia, the Mt. Sinai medical records indicate that Ms. Siegel was recovering from her pneumonia. Among other records, on March 6, 2013 (twelve days before she died), an advanced x-ray at Mt. Sinai revealed Ms. Siegel's condition was "not particularly impressive for pneumonia." There is no medical evidence that her recovery reversed itself, much less that it was pneumonia that killed her. To the

contrary, the death certificate gives the cause of death as end stage dementia and end stage chronic obstructive pulmonary disease.

Dr. Fisher made no attempt to reconcile his opinion that Ms. Siegel died of pneumonia with the records indicating she was recovering from pneumonia and actually died of end stage dementia and chronic obstructive pulmonary disease. This discrepancy is significant because Dr. Fisher's opinions are based solely on the medical records (because he never treated, examined, or saw Ms. Siegel). Dr. Fisher's opinion that pneumonia caused her death, which is based entirely on the medical records, but which is flatly contradicted by the medical records, is entitled to no evidentiary weight.

"When deciding the appropriateness of a directed verdict or JNOV, Florida trial and appellate courts use the test of whether the verdict is, for JNOVs, or would be, for directed verdicts, supported by competent, substantial evidence." Lindon v. Dalton Hotel Corp., 49 So. 3d 299, 303 (Fla. 5th DCA 2010) (citing Speedway SuperAmerica, LLC v. Dupont, 933 So.2d 75, 79 (Fla. 5th DCA 2006)).

Moreover, "[a] motion for directed verdict or JNOV should be granted only if no view of the evidence could support a verdict for the nonmoving party and the trial court therefore determines that no reasonable jury could render a verdict for that party." Lindon, 49 So. 3d at 303 (citing Cecile Resort, Ltd. v. Hokanson, 729 So.2d 446, 447 (Fla. 5th DCA 1999)). Here, the only evidence that could have

11

possibly supported the jury's verdict was Dr. Fisher's opinion. Because Dr. Fisher's opinions are directly contradicted by the medical records upon which they were purportedly based, the trial court properly concluded that they were entitled to no weight.

Affirmed.

SCALES, J., concurs.

LUCK, J., dissenting.

The majority opinion affirms the judgment notwithstanding the verdict for the nursing home because Dr. Fisher's expert testimony was contradicted by other evidence and did not have sufficient evidentiary weight. Because the legal principles for reviewing judgments notwithstanding the verdict do not allow us to reweigh testimony and choose between conflicting evidence, I respectfully dissent. I would reverse the judgment for the nursing home and reinstate the jury's verdict.

The Florida Supreme Court and our court have established four legal principles for reviewing the trial court's judgment notwithstanding the verdict. I will go through each of these principles and apply them to the facts of this case.

*1. A trial court may grant a motion notwithstanding the verdict only where the jury's determination is not supported by the evidence.*

"A trial court may grant a motion notwithstanding the verdict only where the jury's determination is not supported by the evidence." Skidmore, Owings and Merrill v. Volpe Constr. Co., 511 So. 2d 642, 643 (Fla. 3d DCA 1987); see also Stirling v. Sapp, 229 So. 2d 850, 852 (Fla. 1969) ("The trial judge is authorized to grant such motion only if there is no evidence or reasonable inferences to support the opposing position."); Melegen v. Suarez, 951 So. 2d 916, 917 (Fla. 3d DCA 2007) ("A motion for JNOV may be granted only when there is no evidence or inferences to support the opposing party's position."); Collazos v. City of W.

13

Miami, 683 So. 2d 1161, 1164 (Fla. 3d DCA 1996) ("A J.N.O.V. motion may be granted only when there is no evidence or inferences to support the opposing party's position."); Unit. Farm Agency of Fla., Inc. v. DKLS, Inc., 560 So. 2d 1212, 1213 (Fla. 3d DCA 1990) ("Trial courts may grant motions for judgments notwithstanding the verdict only when there is no evidence or inferences which may support the opposing party's position." (emphasis in original)).  Here, the jury determined that the nursing home violated Florida Statutes chapter 400, which was the legal cause of loss, injury, or damage to the Siegel family.  That determination was supported by the evidence.

Dr. Mary Shelkey testified that the nursing home violated chapter 400 in its care, treatment, and supervision of Ms. Siegel during the last two weeks of her stay at the facility.  Dr. Fisher also testified the nursing home violated chapter 400 because it did not render appropriate and acceptable medical care to Ms. Siegel during those last two weeks.  Dr. Fisher testified that the failure to provide Ms. Siegel appropriate care caused her to pass away sooner than she otherwise would have.  The trial court denied the nursing home's Daubert[1] motion seeking to exclude Dr. Fisher's expert testimony because he was unqualified, and his testimony was unreliable and unhelpful to the jury.  Because Dr. Shelkey and Dr.

---

[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

14

Fisher's <u>Daubert</u>-tested evidence supported the jury's verdict, the trial court could not have granted judgment notwithstanding the verdict.

    *2.   By filing a motion for judgment notwithstanding the verdict, the defendants have admitted all evidence against them.*

"By filing a motion for judgment notwithstanding the verdict, the defendants have admitted all evidence against them."  <u>Heyman v. Weka, Inc.</u>, 333 So. 2d 550, 551 (Fla. 3d DCA 1976); <u>see also</u> <u>Stirling</u>, 229 So. 2d at 852 (a party moving for judgment notwithstanding the verdict "admits not only the facts stated in the evidence presented but he also admits every conclusion favorable to the adverse party that a jury might freely and reasonably infer from the evidence" (quotation omitted)); <u>DKLS, Inc.</u>, 560 So. 2d at 1213 ("[T]he party which moves for the judgment notwithstanding the verdict admits all material facts as attested by his adversary . . . ." (quotation omitted)).  Dr. Shelkey and Dr. Fisher testified about two material facts:  (a) the nursing home's care of Ms. Siegel was deficient; and (b) as a result, Ms. Siegel passed away sooner than she otherwise would have.  By moving for judgment notwithstanding the verdict, the nursing home admitted these material facts, which supported the jury's verdict and precluded judgment for the nursing home.

    *3.  In the face of evidence which is at odds or contradictory, all conflicts must be resolved in favor of the party against whom the motion has been made.*

15

"When presented with a motion for judgment notwithstanding the verdict, the trial court must view all of the evidence in a light most favorable to the non-movant, and, in the face of evidence which is at odds or contradictory, all conflicts must be resolved in favor of the party against whom the motion has been made." Irven v. Dep't of Health & Rehab. Servs., 790 So. 2d 403, 406 n.2 (Fla. 2001) (quotation omitted)); see also Melgen, 951 So. 2d at 917 ("When presented with a motion for JNOV, the trial court must view all of the evidence, and all of the inferences drawn therefrom, in a light most favorable to the non-movant, and in the face of contradictory evidence, all conflicts must be resolved in favor of the party against whom the motion has been made."); Russell v. KSL Hotel Corp., 887 So. 2d 372, 377 (Fla. 3d DCA 2004) ("When reviewing an order granting a judgment notwithstanding the verdict, we view the evidence in a light most favorable to the non-moving party, resolve all conflicts in the evidence in favor of the non-moving party, and construe every reasonable conclusion which may be drawn from the evidence in favor of the non-moving party."); J.C. Penny Co. v. Dahlan, 356 So. 2d 64, 65 (Fla. 3d DCA 1978) (affirming denial of motion for judgment notwithstanding the verdict because "the issue of negligence was properly left to the jury on conflicting evidence" and even though "the testimony is conflicting"). The majority opinion concludes that Dr. Fisher's testimony was contradicted by the other evidence in the case. But in reviewing motions for judgment

16

notwithstanding the verdict, we resolve conflicting evidence in favor of the non-moving party, here, the Siegel family.

The majority opinion persuasively details the contradictory evidence, but there was also evidence consistent with Dr. Fisher's testimony. On February 9, 2013, for example, the medical records indicated that Ms. Siegel's condition changed, and she was in respiratory distress. Blood tests and a chest x-ray were ordered. On February 12, her blood test results came back and her white blood cell count was elevated, indicating that she had an infection. On February 15, Ms. Siegel was prescribed a medication for her mood changes, which indicated a change in her mental status. On February 21, Ms. Siegel was diagnosed with congestion and a chest x-ray was ordered "STAT," which means it was an emergency. Ms. Siegel was in distress, had increased pulmonary congestion and increased shortness of breath, and was on continuous oxygen. The standard of care would have been to have Ms. Siegel hospitalized, yet the lack of nursing notes indicated that she was not seen by the nursing staff during the critical days from February 9 to February 21, and was not hospitalized until four days later.

These records were consistent with Dr. Fisher's testimony that Ms. Siegel's health was deteriorating from February 9 to February 21, she was not being properly monitored, she should have been hospitalized on February 21, and if she

had been, she would have survived longer than she did. Because there was conflicting evidence, I would resolve the conflict in favor of the jury's verdict.

*4. A trial court may not reweigh the evidence and substitute its judgment for that of the jury.*

In deciding on a motion for judgment notwithstanding the verdict, "[a] trial court may not reweigh the evidence and substitute its judgment for that of the jury." Collazos, 683 So. 2d at 1164. "This is especially true in negligence cases where the function of the jury to weigh and evaluate the evidence is particularly important since reasonable people can draw various conclusions from the same evidence." Melgen, 951 So. 2d at 917 (quotation omitted); see also Stirling, 229 So. 2d at 852 ("It is ordinarily the function of the jury to weigh and evaluate the evidence." (quotation omitted)); Thomas v. Lumbers Mut. Cas. Co., 424 So. 2d 36, 38 n.1 (Fla. 3d DCA 1982) ("A motion for judgment notwithstanding the verdict can not test the sufficiency of the evidence . . . ."); J.C. Penny Co., 356 So. 2d at 65 ("It is not this court's province to substitute its judgment for that of the trier of facts."); Heyman, 333 So. 2d at 552 ("[T]he trial court committed reversible error in vacating the jury's verdicts and substituting its own evaluation of the weight of the evidence."). Here, the majority opinion agrees with the trial court that – and affirms the judgment notwithstanding the verdict because – Dr. Fisher's testimony did not have sufficient weight.

18

The contradictory medical records were presented to the jury. Dr. Fisher was cross-examined on these records. Still, after reviewing the conflicting records, listening to Dr. Fisher's direct and cross-examination, and hearing the attorney's arguments during closing about why he should and shouldn't be believed, the jury credited Dr. Fisher's testimony in finding that the nursing home violated chapter 400, which caused the Siegel family's injuries. We should not reweigh Dr. Fisher's testimony and substitute our view for the jury's.

* * *

The trial court's power to grant judgment notwithstanding the verdict is limited, and should be done with "extreme caution." Heyman, 333 So. 2d at 551. If there is any evidence supporting the jury's verdict, it is admitted by the party moving for JNOV and the verdict must stand. If there is a contradiction between the evidence, the conflict must be resolved in favor of the verdict. If the jury credits certain testimony over other evidence, we cannot reweigh it. Applying these principles to the trial court's judgment notwithstanding the verdict for the nursing home, I would reverse the JNOV and reinstate the jury's verdict.