840 So.2d 277 (2003)
CAPE PUBLICATIONS, INC., etc., et al., Appellants,
v.
Kathy REAKES, Appellee.
No. 5D01-1693.
District Court of Appeal of Florida, Fifth District.
January 31, 2003.
Rehearing Denied March 18, 2003.
*278 Jack A. Kirschenbaum of Gray, Harris & Robinson, P.A., Melbourne and Robert C. Bernius of Nixon Peabody, LLP, Washington, D.C., for Appellants.
Douglas R. Beam of Douglas R. Beam, P.A., Melbourne, and James R. Dressler, Cocoa Beach, for Appellee.
PETERSON, J.
Melinda Meers and Cape Publications, Inc., d/b/a Florida Today appeal a $400,000 judgment for defamation following a jury trial. Phil Currie also appeals a $500 judgment for defamation and Florida To-day appeals a $10,000 judgment for conversion.
Employed as a reporter by Florida Today, a Florida newspaper, Kathy Reakes and another reporter, John McAleenan, were assigned the task of investigating Anita Gonzalez, who was under arrest for murder at the time. Reakes and McAleenan were working on a "color piece" to provide some background information about Gonzalez and the neighborhood in which she lived. The two traveled to an apartment complex in which Gonzalez had rented an apartment and discovered that after a police raid of the dwelling, the apartment was unoccupied and the backdoor open. McAleenan entered the apartment and discovered that it had been ransacked. Reakes later testified that she proceeded approximately ten steps into the apartment and remained inside for about 30 to 60 seconds, but was able to report that the refrigerator door was open, furniture was broken, and trash was strewn about the floor. Discovering a document on the floor which appeared to contain a list of phone numbers, McAleenan took it so that they could later investigate and call the numbers.
After the two returned to the Florida Today offices, the news of the reporters' activities was relayed to others. Reakes told Florida Today's metro editor that the two had "kicked in the apartment door" in order to gain entry. The metro editor thought that the unauthorized entry was serious enough to report the actions of the two reporters to Meers, the Florida To-day managing editor. Later that evening, Meers phoned Reakes at her home to ask if Reakes had indeed entered Gonzalez's apartment and obtained an affirmative answer.
When Reakes reported to work the next day, Meers told her that she and McAleenan were being terminated because of their actions at Gonzalez's apartment and was summarily escorted from the building.
Tom Squires, a Florida Today assistant managing editor, was not at the office the day Reakes and McAleenan were terminated. He was not involved in the decision to terminate the two, but had heard the basic facts concerning the events. Arriving for work the following day, he encountered Meers taking a break outside the Florida Today offices. Squires asked Meers about the reason for the terminations and Meers informed him that Reakes and McAleenan were terminated because they had committed criminal acts. It was this statement by Meers to Squires that was the basis of Reakes' defamation *279 claim against Meers and the newspaper.[1]
After Reakes and McAleenan were terminated, Florida Today, on the advice of their attorney, turned the list McAleenan had taken from the apartment over to the circuit court in a sealed envelope without ever mentioning Reakes' name. A circuit judge opined that the document could be relevant to the murder case against Gonzalez and could also be evidence of trespassing or burglary by the reporters. Accordingly, the judge reported the matter to the grand jury and the State subpoenaed Meers to determine the manner in which the document came into the possession of Florida Today. Although the State felt the crimes of trespassing and burglary had been committed, it decided not to pursue the matter because of potential interference with the Gonzalez murder prosecution.
As news of the terminations spread, aided by Reakes' accounts, the story received national attention, including stories in the Orlando Sentinel, Washington Post, and Los Angeles Times. There was also a piece about the terminations in the Columbia Journalism Review, which criticized the paper and expressed the opinion that Reakes and McAleenan should have been supported by Florida Today in their entry into the apartment. Phil Currie, a senior officer of Gannett Co., the owner of Florida Today, responded to the criticism in a June 1996 speech to Gannett publishers and editors. He did not mention the reporters by name, but stated that the "story has become so twisted that editors appear wrong for believing that newspaper people should not break the law, and the reporters appear to be heroes for admittedly having done so." The text of Currie's speech was subsequently published on a Gannett website. The quoted statement was the basis for Reakes' defamation claim against Currie.
Reakes sued Meers, Currie, and Florida Today, making multiple claims, including defamation, conversion, and wrongful termination. After several years of motion practice, the only claims left for trial were her defamation claims because of Meers and Currie's statements that Reakes had broken the law and Reakes' conversion claim. At trial, Reakes stated that she had trouble finding employment after the claims of criminal wrongdoing and that she had also suffered emotional harm because of the accusations. She further testified that an unreturned box of personal items under her desk had contained notes and information from a confidential informant concerning a case involving the "vampire rapist." She stated that she was planning on writing a book about that case, but now could not do so because of the conversion of the materials.
At the conclusion of the trial, the jury returned a verdict in Reakes' favor awarding her $400,000 on the defamation claim against Meers and Florida Today ($150,000 for past lost wages, $150,000 for future lost wages, and $100,000 for loss of reputation), $500 on the defamation claim against Currie, and $10,000 on the conversion claim against Florida Today.
It is the judgments entered pursuant to the verdicts that have been appealed.

I. THE STATEMENTS.
A plethora of cases exist which proclaim that a required element of defamation is a false statement[2] made about *280 another. See, e.g., Linafelt v. Beverly Enterprises-Florida, Inc., 745 So.2d 386, 388 (Fla. 1st DCA 1999); Smith v. Cuban Am. Nat'l Found., 731 So.2d 702, 705 (Fla. 3rd DCA 1999), rev. denied, 753 So.2d 563 (Fla.2000). Stated differently, if the statements are true, the required element of a false statement is not present. See Linafelt, 745 So.2d at 389 ("However, the statement was true. Accordingly, appellant's claim for defamation must fail.") In its instructions to the jury, the trial court defined the criminal offenses of trespass of a structure, theft, and burglary. More specifically, pursuant to section 810.08, Florida Statutes (1995), the court instructed the jury that one was guilty of trespass of a structure "if she, without being authorized, licensed, or invited, willfully enters a structure." In the instant case, Reakes, herself, admitted that she entered Gonzalez's apartment without permission from Gonzalez or the owner of the apartment. The unauthorized entry constituted the crime of trespass of a structure and the statements made by Meers and Currie appear to be true statements. Meers accurately stated that Reakes and McAleenan had committed "criminal acts." Currie stated that journalists were being celebrated for admittedly breaking the law. Although Reakes did not expressly admit that she broke the law, she admitted that she had entered a structure without permission, making Currie's statement substantially true. See Smith, 731 So.2d at 706 ("Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the `gist' or the `sting' of the statement is true.")
Accordingly, if the statements made by Meers and Currie were substantially true, the defamation verdicts are reversible. See id. at 705 ("[A] reviewing court may reverse a jury verdict and instruct the lower court to enter a judgment in favor of the defendant where the statement is not capable of a defamatory effect, i.e., not a false statement which naturally and proximately results in injury to another.")

II. QUALIFIED PRIVILEGE.
Even if one assumes that the statements made by Meers and Currie were not substantially true, no liability would attach for the statements if they were protected by a qualified privilege and were made without express malice.
If a speaker makes a statement to another and the two share a legal interest in the subject matter of the statement, the statement is protected by a qualified privilege and is not actionable unless made with express malice. See Nodar v. Galbreath, 462 So.2d 803, 809 (Fla.1984). The issue of whether this qualified privilege exists is not a jury question when the circumstances surrounding the communication are undisputed; the question should be decided by the court. See id. at 810. There is no dispute about the circumstances *281 surrounding Meers' or Currie's statements. Meers was outside the Florida Today office building on a break when she responded to the question of a fellow editor about the employees. Currie was making a speech to editors of Gannett newspapers. Neither side in this case disputes those circumstances and the trial court should have found that the privilege existed. Id.; Randolph v. Beer, 695 So.2d 401 (Fla. 5th DCA 1997) (statements made by credit union's chairman of the board to the members of the board concerning a rumor about illegal activities of an insurance agent enjoyed a qualified privilege because the speaker and listener both shared a legal interest in the subject matter of the statements).
Once it is determined that a qualified privilege exists, a further examination is necessary to determine whether the speaker lost the privilege because of express malice. This has been described as "ill will, hostility, evil intention to defame and injure. Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege destroyed." Nodar, 462 So.2d at 811. There was no showing of malice in the instant case and the circumstances seem to be exactly those which the privilege was designed to protect.

III. DEFAMATION DAMAGES.
In order to recover for defamation, a plaintiff must show that the damages were proximately caused by the defamatory statements. See Smith, 731 So.2d at 705. There was no showing of proximate cause in this case concerning the statement made by Meers. The trial judge instructed the jury that the case was not one of wrongful termination, but was only about defamation. When the jury awarded $400,000 to Reakes because of Meers' statement, this admonishment was apparently ignored. Accepting Reakes' testimony concerning her inability to find meaningful employment and her emotional difficulties at face value, it is clear that these damages came as a result of being fired and learning that Meers had told Squires that she was fired for committing a crime. Meers only made this statement to Squires, who admittedly did not repeat it to others. Squires, in fact, disagreed with the decision to terminate Reakes and made efforts to help her secure employment. Absent any showing of damages as a result of Meers' statement to Squires, that portion of the verdict must be reversed.

IV. CONCLUSION.
Statements made by Meers and Currie which were the subject of Reakes' defamation claims were true statements and Reakes failed to present a prima facie case for defamation. Moreover, the statements were protected by a qualified privilege which was never lost in the absence of express malice. Reakes also failed to demonstrate that the statement made by Meers proximately caused any of her injuries.
The judgments against Meers, Currie and Florida Today are reversed. We affirm the judgment for $10,000 on the conversion count against Florida Today.
AFFIRMED in part; REVERSED in part.
PLEUS, J., concurs.
GRIFFIN, J., dissents, with opinion.
GRIFFIN, J., dissenting.
This is an intriguing case. The key legal issue seems straightforward enough, *282 but it may be more complicated and harder to satisfactorily answer than appears on the surface. The majority overturns the jury's verdict finding the defendants liable for defamation because, as a matter of law, under the facts proved at trial, the plaintiff had committed "a criminal act."
Examining the facts, as we must, in the light most favorable to the jury's verdict, the plaintiff reporter, Kathy Reakes ["Reakes"], was assigned by Florida Today in January 1996 to obtain background information regarding a gang of criminals who were operating from a location in a public housing area in Melbourne, Florida. The leader of this gang was a female named Anita Gonzalez. John McAleenan, another veteran reporter with Florida Today, also was assigned to the story. Florida Today instructed Reakes and Mr. McAleenan to go to this location to get background information for a story regarding Ms. Gonzalez and her gang. Appellee and Mr. McAleenan went to the location in separate cars. It was midmorning and residents of the public housing area were outside and talked with the two reporters.
Mr. McAleenan saw that the door to the apartment from which the gang had been operating was hanging open after having been smashed in by the Melbourne Police Department SWAT team. The location had been ransacked during a raid. The power was off and the apartment appeared to be abandoned. Mr. McAleenan walked through the open door and called out for Reakes to look inside. Reakes took a few steps inside the open door which led to the kitchen. She observed that the refrigerator doors were open, raw foods, i.e., bread, lettuce, broken eggs were all over the floor; garbage cans had been overturned; and garbage littered the floor. Reakes said that it looked like a tornado had gone through there. Reakes remained for approximately thirty seconds to a minute and left. She did not remove anything. This was the "criminal act."
The rule of law established in the majority opinion is that, in Florida, a reporter's entry into a structure without the owner or possessor's permission, no matter how brief or slight, no matter the status of the site, no matter whether the purpose is to gather news, is criminal trespass as a matter of law. The jury received a very detailed special verdict form in this case that asked whether the statement made by Merlinda Meers that the plaintiff "had committed criminal acts" was substantially true. The jury said no. Under the facts presented, I think this verdict was legally permissible. The statement that appellee "committed criminal acts" has, at best, only marginal factual content. The entry into the criminal's apartment was slight and the property "trespassed upon" was the ransacked, and apparently abandoned site of a police raid whose door was hanging open. Reakes was never prosecuted.
The question this case raises is whether a reporter has any leeway to enter into a crime scene such as this for newsgathering purposes. This has apparently been a contentious issue for many years and largely remains unresolved. See, e.g., Note, Press Passes and Trespasses: Newsgathering on Private Property, 84 COLUM. L.REV. 1298 (1984). There is an interesting decision of the Florida supreme court, Florida Publishing Co. v. Fletcher, 340 So.2d 914, 915-16 (Fla.1976), a case which is, to me, important for a proper consideration of this case under Florida law, even though not cited by the parties.
In Fletcher, a fatal fire had occurred in a private home. Reporters entered the property to investigate for a news story and a news photographer took photographs, some at the request of law enforcement on the site. The homeowners *283 sued the reporters civilly for trespass but the supreme court found no liability as a matter of law on grounds of "custom" or "implied consent," which will authorize entry on private property and avoid a claim of trespass. The court ruled that it is "customary" to allow the press admittance to such sites where a calamity has occurred. Accordingly, the court ruled that the reporter could not be held liable for trespass. Fletcher has been the subject of criticism, but it remains the law of Florida. See Kent R. Middleton, Journalists, Trespass, and Officials: Closing the Door on Florida Publishing Co. v. Fletcher, 1989 PEPP. L.REV. 259 (1989).
The dissenting judge at the district court of appeal level in Fletcher,[1] whose opinion the supreme court later approved, explained why he viewed the entry by the press onto the Fletchers' property not to be a trespass at all:
It is not questioned that this tragic fire and death were being investigated by the fire department and the sheriff's office and that arson was suspected. The fire was a disaster of great public interest and it is clear that the photographer and other members of the news media entered the burned home at the invitation of the investigating officers. (Numerous members of the general public also went through the burned house.) Many affidavits of news editors throughout Florida and the nation and affidavits of Florida law enforcement officials were filed in support of appellee's motion for summary judgment. These affidavits were to the general effect that it has been a long-standing custom and practice throughout the country for representatives of the news media to enter upon private property where disaster of great public interest was occurredentering in a peaceful manner, without causing any physical damage, and at the invitation of the officers who are investigating the calamity. The affidavits of law enforcement officers indicate that the presence of the news media at such investigations is often helpful to the investigations in developing leads, etc. The affidavits as to custom and practice do not delineate between various kinds of property where a tragedy occurs. They apply to any such place. If an entry is or is not a trespass, its character would not change depending upon whether or not the place of the tragedy is a burned out home (as here), an office or other building or place. An analysis of the cases on implied consent by custom and usage, indicates that they do not rest upon the previous nonobjection to entry by the particular owner of the property in question but rest upon custom and practice generally. Implied consent would, of course, vanish if one were informed not to enter at that time by the owner or processor or by their direction. But here there was not only no objection to the entry, but there was an invitation to enter by the officers investigating the fire. The question of implied consent to news media personnel to enter premises in a circumstance such as this appears to be one of first impression not only in this jurisdiction but elsewhere. This, in itself, tends to indicate that the practice has been accepted by the general public since it is a widespread practice of long standing. Due to such widespread and long-standing custom, reason and logic support the application of implied consent to enter the premises in the case before us.

319 So.2d at 113-14. (Emphasis added.)[2]
If one judge out of three district court of appeal judges and five justices of the Supreme *284 Court of Florida could conclude that the reporter's entry onto the private residence in Fletcher could not support even a claim of civil trespass because of a "widespread practice of long standing," "accepted by the general public" to allow the press some access to the scene of a newsworthy event such as a fire, then a jury certainly should be permitted to decide that what Ms. Reakes did was not criminal trespass by her either because Ms. Reakes lacked criminal intent or because such a limited intrusion would not be recognized as a crime based on a widespread practice of long standing accepted by the general public. The jury may have concluded that the newspaper, by accusing Ms. Reakes of criminal acts, grossly overreacted.[3] Under these circumstances, the jury was entitled to find that it was not substantially true that this entry was a criminal act. Reading this record, one could also conclude that Ms. Reakes' nonchalance, if not arrogance, was at least partly responsible for the newspaper's overreaction, but perhaps the jury did not see it that way. It was, however, a decision for the jury to make.
I would affirm.
NOTES
[1] The jury verdict form was concerned only with this statement from Meers to Squires and not to anyone else.
[2] Other cases create confusion, however, when the decisions state that truth is not a complete defense to defamation unless it is accompanied by good motives. See, e.g., Lipsig v. Ramlawi, 760 So.2d 170, 183 (Fla. 3d DCA 2000), rev. denied, 786 So.2d 579 (Fla. 2001); Drennen v. Westinghouse Elect. Corp., 328 So.2d 52 (Fla. 1st DCA 1976). The requirement of good motives is derived from article I, section 4 of the Florida Constitution which states that in any civil action for defamation, the party accused shall be exonerated "if the matter charged as defamatory is true and was published with good motives." There was no issue of "good motives" in the instant case as there was absolutely no evidence that the statements in question were made with any sort of spite or ill will that might be construed as bad motives. Meers simply answered a question of Squires when he asked her why Reakes and McAleenan were terminated. Her answer, the subject of the defamation claim, was simply relaying that information to her assistant managing editor. Likewise, Currie was making a broad-based statement to editors about the ethics of journalism and never mentioned Reakes by name.
[1] Fletcher v. Florida Pub. Co., 319 So.2d 100 (Fla. 1st DCA 1975).
[2] It is true that, in Fletcher, the court refers to the fact that the reporter was authorized by the police to enter the premises, but if the police invitation was sufficient to avoid the trespass claim, the high court would not have needed to decide the case on the basis of "custom" and "implied consent."
[3] The Florida Standard Jury Instruction on criminal trespass includes the following:

Authority to [enter] [remain in] a structure or conveyance need not be given in express words. It may be implied from the circumstances. It is lawful to [enter] [remain in] a structure or conveyance of another if, under all the circumstances, a reasonable person would believe that he had the permission of the owner or occupant.