LINDSEY, J.
International Security Management Group, Inc. ("ISMG") and Jorge Acuna appeal ("Acuna") from a final judgment entered after a jury verdict in favor of William and Lisa Rolland (the "Rollands"). The Rollands cross-appeal the trial court's partial denial of their motion for leave to amend the complaint to add punitive damages against ISMG.[1] Because there is a reasonable possibility that the jury could *38 have been misled by the failure to give ISMG and Acuna's requested jury instruction on qualified privilege, we reverse and remand for a new trial on the intentional tort claims. Further, we reverse the trial court's denial of ISMG and Acuna's directed verdict regarding the negligence claims raised by Mr. Rolland, as such claims were legally invalid or unsupported by the evidence. Finally, we affirm the trial court's partial denial of the Rollands' motion for leave to amend the complaint to add punitive damages against ISMG.
I. BACKGROUND
In July of 2011, William Rolland was a professional videographer visiting Miami for work and was scheduled to film an interview with a company executive for a business located at New World Tower in downtown Miami. The Israeli and German consulates were also tenants of New World Tower. Panther Management Services, LLC ("Panther Management") managed New World Tower while the office building was owned by several related entities ("the NWT Owners"). On the day of the incident, Jorge Acuna was the security guard posted to the lobby of New World Tower and was employed by ISMG.
On July 25, 2011, Mr. Rolland was arrested and later indicted by a federal grand jury for making a false or hoax bomb threat against the New World Tower in downtown Miami. A criminal trial was held in December of 2011 and he was found not guilty.
A year and a half later, the Rollands sued the NWT Owners, ISMG, Panther Management, Acuna, Omar Clavero ("Clavero") and Andres Caamano Osuna ("Osuna"). The operative complaint is the third amended complaint which alleged defamation, malicious prosecution and negligence claims against Acuna, Clavero and Osuna based on their statements that Mr. Rolland made a bomb threat. It also alleged negligence claims against Panther, 100 NWT, and ISMG for negligent hiring/staffing, training, and supervision of employees. The case proceeded to a jury trial.
A. The New World Tower Incident
While talking on a cell phone and carrying a large case and camera tripod, Mr. Rolland entered the lobby of New World Tower on July 25, 2011. Acuna observed Mr. Rolland enter the building while talking on a cell phone and carrying a tripod and large black box.[2] Acuna testified that once inside the lobby, Mr. Rolland engaged in an unusually loud cell phone conversation and refused to respond to his questions and offers of assistance. Acuna explained that he grew suspicious and radioed Osuna, the assistant building engineer, to come to the lobby based on Mr. Rolland's unresponsiveness, loud phone discussion, and large black box. Osuna then joined Acuna at the security desk and testified that he also grew suspicious based on Mr. Rolland's behavior and the case, with him in the lobby.
After the phone call ended, Mr. Rolland walked toward the security desk and began speaking directly with Osuna. Both Acuna and Osuna testified that when Mr. Rolland approached, he used expletives and asked whether they had a problem with people talking on the phone in the building lobby. Mr. Rolland, however, denied using expletives and testified that his interaction with Osuna was innocuous. While Acuna assisted other individuals, *39 Osuna proceeded to explain to Mr. Rolland their concerns regarding his large case. Mr. Rolland informed Osuna that he needed to film in and around the building and was scheduled to return the following day to film the building's owner.[3] Osuna explained that before filming in or around the property, Mr. Rolland first needed to obtain security approval from the building. Mr. Rolland testified that he agreed to comply with such a requirement.
At this point, Mr. Rolland left the lobby and began filming the office building from outside on the sidewalk. Clavero, the chief building engineer and Osuna's supervisor, went outside with Acuna to speak with Mr. Rolland, but there was conflicting testimony at trial as to precisely what was said between the men. Mr. Rolland testified that he was in the middle of filming angles of the building when Clavero approached and stated that he could not take pictures. According to Mr. Rolland, he told Clavero that it was a public area and that he was allowed to take pictures, at which point Clavero threatened to call the police. Clavero testified that he approached and repeatedly asked Mr. Rolland what he was doing, but that Mr. Rolland was unresponsive and finally gave an expletive-laden retort that this was America and he could do whatever he wanted. Acuna's testimony was consistent with Clavero's account. However, Mr. Rolland denied using any profanities and stated that Clavero and Acuna never identified themselves to him.
Returning to the lobby, Clavero told Acuna to call Eran Miranda, the director of security for the Israeli Consulate, for his assistance in assessing the situation. Clavero testified that he asked Acuna to call for Miranda's help because Miranda had more experience and training in how to handle such situations. Acuna, Clavero, and Osuna each testified that, shortly after Clavero and Acuna came back inside the lobby, Mr. Rolland stuck his head through a front door and declared that he was returning tomorrow to "blow up the f***ing building." However, Mr. Rolland vehemently denied ever using expletives or making any type of bomb threat. Instead, Mr. Rolland claimed that he was unsure if Clavero actually intended to call the police so he stuck his head back into the lobby to inform someone with New World Tower where he was staying. According to Mr. Rolland, he informed Acuna that he was staying at the Intercontinental Hotel and gave his room number in case the police were actually called.
Miranda subsequently came down to the lobby and was informed of the alleged bomb threat situation by Clavero, while Acuna pointed out Mr. Rolland to Miranda as he walked away down the sidewalk. Miranda then called Officer Wanda Mendez[4] with the City of Miami Police Department to report the purported bomb threat situation. Officer Mendez notified her dispatcher of the New World Tower incident and to send units, stayed in contact with Miranda, and departed for the scene herself. A short time later, Mr. Rolland was taken into custody.
The South Lobby Camera Recording
At the time of the incident, New World Tower had a south lobby camera and north *40 lobby camera. The north lobby camera recorded inside the lobby, and testimony elicited at trial suggested that the south camera lobby would have captured Mr. Rolland filming the outside of the building before re-entering to make the purported bomb threat. The north lobby camera captured most of the interactions Mr. Rolland had inside the lobby on the day of the incident and was relied on by both sides throughout trial. However, the Rollands made no request to preserve either camera recording for the federal criminal case or for the instant civil action. Only the north lobby camera recording was ultimately preserved and downloaded.
During a motion in limine hearing on July 14, 2016, the trial court reiterated that the Rollands' discussion and inquiry regarding the missing south lobby camera recording would be limited to preclude any allegation or inference of evidence spoliation. In responding to concerns from the defendants that the Rollands were attempting to improperly suggest that the south lobby camera recording had been tampered with or deleted, the trial court stated:
THE COURT: All right. Here's what I'm doing. I am not going to permit you to make an allegation that-or an inference-that anybody intentionally destroyed any video footage of the incident, but I will permit you to explain to the jury in detail the conditions upon which this incident occurred, including any cameras that are located on the property and whether or not the camera actually captured the image, to the extent that you know that.
There was conflicting testimony as to who actually downloaded the security camera recording for law enforcement. Acuna, Osuna, and Clavero thought Albert Hammond, an employee for a third party vendor hired to manage the telecom data for New World Tower, had downloaded the video recording. However, Hammond testified that he was never asked to download the security footage of the incident.
Nonetheless, the Rollands' counsel repeatedly brought up the missing south lobby camera recording throughout trial. Counsel for the Rollands stated during opening remarks that, although the south lobby camera would have captured Mr. Rolland filming the outside of the building, "none of that video was given to the FBI."[5] The Rollands repeatedly questioned the individual defendants about who had access to the security camera system, characteristics of that system, what the south lobby camera would have captured, and who has previously downloaded security videos, among other lines of inquiry.
At one point during cross-examination about the missing south lobby camera recording, Clavero was asked whether he wanted to "say it was somebody else because you chose not to download the video showing you going out on to the sidewalk and confronting and harassing my client?" Defense counsel objected, raising the court's prior order from the motion in limine hearing. At the end of Clavero's testimony, the jury asked, among others, "why was only one camera feed given to the FBI" if Clavero was there when Albert Hammond downloaded the video of the *41 incident. However, the trial court sustained a defense objection and refused to ask the juror's question.
Moreover, counsel for the Rollands continued to focus on the security camera system during closing arguments and suggested that various explanations by the individual defendants and the property manager, Shari Simms, were not credible:
Let's talk a little bit about the video footage. There was certainly significant evidence listed on that issue.
We heard testimony from Mr. Osuna and Mr. Acuna and Mr. Clavero. We didn't download the video. We didn't have anything to do with it. We didn't look at it. Because we don't have the passcode, the important passcode that only Mr. Hammond had. But Mr. Hammond was the only one that had it.
How is it possible, first of all, that Ms. Simms didn't even know if it was -- I asked her, I don't know if you took notes on that, was there a passcode? I don't know. And what happened when Mr. Hammond left? The testimony was we called his prior employer. His prior employer who he didn't even work for to get the passcode.[6]
Well, what was the prior employer doing with the passcode for a high security building with colocation tenants that have high security. And what happened when Mr. Hammond got sick and couldn't operate the computer and download video, because it wasn't just the video.
If you listen to the evidence, Mr. Osuna said it was cards, access cards for people when they needed the building, you had the same passcode. So what would happen if Mr. Hammond decided to go on vacation for a week or call in sick, are none of the tenants going to have access? If there's an emergency video, who's going to operate? It does make sense?
B. Acuna's Arrest and Mr. Rolland's Good Character Evidence
Acuna submitted an employment application to ISMG in July of 2007. When Panther Management contracted for ISMG to take over the security services for New World Tower, Acuna was recommended to ISMG because he was already working as a licensed security guard for the building. ISMG performed a seven-year background check on Acuna, which indicated no prior criminal record. In fact, Acuna had previously been arrested, but not convicted, for grand theft and dealing with stolen property in 1993. Specifically, Acuna was accused of stealing approximately 52,000 bottles of perfume while employed as a plant manager for a perfume company in 1993. However, Acuna denied any wrongdoing and adjudication was ultimately withheld after he entered a nolo contendere plea.
To support their claim for negligent hiring, the Rollands sought to introduce evidence of Acuna's 1993 arrest. In particular, the Rollands argued that Acuna should never have been hired to work at New World Tower because a provision in the service contractor agreement between ISMG and Panther Management barred the assignment of any security personnel *42 to New World Tower if "charged or convicted of any crime." Before trial, ISMG filed a motion in limine to exclude any evidence regarding Acuna's arrest record. Although the trial court barred the Rollands from discussing the specifics of Acuna's arrest, it denied the motion in limine and permitted the Rollands to ask questions, over contemporaneous objections, about Acuna's arrest in relation to ISMG's contract with Panther Management.
During trial, counsel for the Rollands repeatedly asked ISMG's corporate representative, Jeffrey Himebaugh, and Acuna's supervisor, Robert Artola, whether either of them knew of Acuna's arrest before he was hired or if Acuna ever received a formal reprimand.[7] Over objections, the Rollands also asked whether ISMG would have employed Acuna if his arrest had been known or whether anyone with ISMG subsequently became aware that Acuna had been charged with a crime. Both Mr. Artola and Mr. Himebaugh stated that an industry-standard background check was performed and did not reveal an arrest from 1993. Both men also testified that Acuna did not have disciplinary reports in his personnel file. Moreover, Mr. Himebaugh explained that, even if made aware of Acuna's arrest, he would have first let the property management company decide what course of action to take because Acuna was recommended to ISMG when ISMG took over security services for the building. Additionally, contemporaneous objections were made when Acuna was asked directly whether he had been charged with a crime and whether he had ever been fired from a previous employer.
During closing arguments, the Rollands' counsel emphasized that the provision in ISMG's contract with Panther Management prohibiting any personnel charged or convicted of a crime from working at New World Tower applied to Acuna. At the end of his closing remarks, counsel for the Rollands told the jury to do what they think is right, reminded them that Acuna still worked at New World Tower, and then asked, "[w]ho unleashed Jorge Acuna on the public?" Defense again made a contemporaneous objection.
In contrast, Mr. Rolland proffered evidence of his good character and professional reputation in order to rebut the accusations that he used expletive-laden language and was aggressive on the day of the incident. Additionally, Mr. Rolland argued that such character evidence was directly relevant to the damages element of his defamation claim. The trial court permitted two clients of Mr. Rolland to testify about his "professional" reputation and that they would still work with him regardless of the New World Tower incident. One client further testified that Mr. Rolland was never vulgar or profane in his professional capacity, and that he hired Mr. Rolland based on his experience and capacity to create a "professional, respectful, and an overall positive image" of the client's company. In addition to the good character evidence referred to throughout closing argument, counsel for the Rollands also asked the jury to consider how much money would be sufficient "to compensate a man who was never arrested before in his life ... [a]nd for 52 years played by the rules." Later, counsel for the Rollands suggested that an award of $10 million on the *43 defamation claim was appropriate "for somebody like Mr. Rolland, who never had a parking ticket."
C. Jury Instructions
Finally, there was disagreement over the final jury instructions regarding qualified privilege defenses to Mr. Rolland's defamation claim. Specifically, the defendants sought to instruct the jury that a presumptive privilege exists for an individual to report a suspected crime to law enforcement, even if that statement is ultimately false. Additionally, the defendants requested a qualified privilege defense for a person to report a suspected crime to another person having a corresponding shared interest or duty in reporting that crime.
On July 28, 2016, the parties met with the trial court to discuss the proposed jury instructions and verdict form. The defendants argued that an additional qualified privilege defense should be included because Acuna had a shared interest with Miranda, as head of security for the Israeli Consulate, in the safety of the building. However, the trial court indicated that it was inclined to submit the Rollands' proposed instructions. The next morning, the defendants submitted a revised proposed jury instruction emphasizing the qualified privilege language they sought to be included:
On the defense of qualified privilege, I instruct you that provided one does not speak with improper motives, which I shall explain in a moment, a person such as Defendants Acuna, Osuna, and Clavero is presumptively privileged to make a statement to law enforcement or the prosecuting government attorney regarding the reporting of a suspected crime prior to the institution of criminal charges, even if the statement is ultimately untrue. Further, Defendants Acuna, Osuna, and Clavero would have a qualified privilege to make the same report of a suspected crime to the head of security at the Israeli Consulate if you find that these Defendants and the head of security at the Israeli Consulate had a shared interest or duty in reporting the alleged bomb threat to police. A person does not, however, have a qualified privilege to make a statement accusing someone of a crime to a private citizen.
(emphasis in original). However, the following instruction submitted by the Rollands was ultimately provided to the jury:
On the defense of qualified privilege, I instruct you that provided one does not speak with improper motives, which I shall explain in a moment, a person such as Defendants Acuna, Osuna, and Clavero is presumptively privileged to make a statement to law enforcement or the prosecuting government attorney regarding the reporting of a suspected crime prior to the institution of criminal charges, even if the statement is ultimately untrue. A person does not, however, have a qualified privilege to make a statement accusing someone of a crime to a private citizen .
(emphasis added).
ISMG and Acuna assert on appeal that the trial court erred by excluding the shared interest qualified privilege to Mr. Rolland's defamation claim. ISMG and Acuna further assert that the erroneous instruction gave a judicial stamp of approval to the Rollands' argument throughout trial that it was a mistake for Acuna to first contact Miranda instead of calling 911. Indeed, the Rollands' counsel emphasized Acuna's failure to first call 911 during opening remarks, throughout trial, and during closing arguments.
*44 D. The Verdict and Appeal
The jury returned a verdict in favor of the Rollands, on Mr. Rolland's defamation, malicious prosecution, negligence, and negligent hiring causes of action, and for Lisa Rolland's loss of consortium claim. However, the NWT Owners, Panther Management, Clavero, and Osuna settled with the Rollands post-trial, and the trial court entered a final order of dismissal with prejudice as to the settling defendants on November 4, 2016. On December 7, 2016, the trial court entered a final judgment pursuant to the jury verdict. The trial court also entered an order on December 7, 2016 denying ISMG and Acuna's post-trial motions, which included a motion for a directed verdict on the Rollands' negligence claims. The instant appeal and cross-appeal ensued.
II. STANDARD OF REVIEW
A trial court's decision on jury instructions is reviewed for abuse of discretion and "should not be overturned on appeal absent a showing of prejudicial error." Gonzalez v. Rose, 752 So.2d 39, 41 (Fla. 3d DCA 2000) (citing Goldschmidt v. Holman, 571 So.2d 422, 425 (Fla.1990) ). Similarly, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. H & H Elec., Inc. v. Lopez, 967 So.2d 345, 347 (Fla. 3d DCA 2007) (citing Blanco v. State, 452 So.2d 520 (Fla. 1984) ). The denial of a directed verdict is reviewed de novo , viewing all evidence adduced at trial and every reasonable inference from that evidence in the light most favorable to the non-moving party. Northrop Grumman Sys. Corp. v. Britt, 241 So.3d 208, 213 (Fla. 3d DCA 2017). A trial court's denial of a motion for new trial based on improper closing remarks is reviewed for an abuse of discretion. See Tanner v. Beck ex rel. Hagerty, 907 So.2d 1190, 1196 (Fla. 3d DCA 2005).
III. ANALYSIS
On appeal, ISMG and Acuna raise the following issues: (i) a new trial is required on the intentional tort claims because the trial court abused its discretion by submitting an erroneous jury instruction that omitted the requested shared interest qualified privilege defense; (ii) a new trial is further required on the intentional tort claims because the trial court abused its discretion in admitting improper evidence during trial; (iii) a directed verdict should have been granted on the negligence claims; and (iv) the trial court erred in denying a motion for new trial based on improper closing arguments made by the Rollands' counsel. Additionally, the Rollands cross-appeal the trial court's denial of their motion for leave to amend their complaint to state a claim for punitive damages against ISMG pursuant to section 768.72, Florida Statutes (2015).[8]
A. Qualified Privilege Jury Instruction
"The failure to give a requested jury instruction constitutes prejudicial error when there is a reasonable possibility that the jury could have been misled by the failure to give the instruction." Barkett v. Gomez, 908 So.2d 1084, 1086 (Fla. 3d DCA 2005) (citing Golian v. Wollschlager, 893 So.2d 666, 667 (Fla. 1st DCA 2005) ). In order to demonstrate reversible error based on a the trial court's failure to give a requested jury instruction, a party must establish that: (i) the requested instruction contained an accurate statement of the law, (ii) the facts of the case supported a *45 giving of the instruction, and (iii) the instruction was necessary for the jury to resolve the issues of the case. See Font v. Union Carbide Corp., 199 So.3d 323, 326 (Fla. 3d DCA 2016) (citation omitted) (internal quotation marks omitted). ISMG and Acuna have met this burden.
The foundation of Mr. Rolland's defamation claim are the statements made to the head of security at the Israeli Consulate located at New World Tower, as well as the subsequent remarks to the City of Miami Police and the FBI regarding the bomb threat that Acuna, Osuna, and Clavero contend Mr. Rolland made on July 25, 2011. The final jury instruction accurately stated that Acuna, Osuna, and Clavero were presumptively privileged to make a statement to law enforcement regarding the reporting of a suspected crime.
Where ISMG and Acuna take issue is the very next sentence of the jury instruction, which provides that "[a] person does not, however, have a qualified privilege to make a statement accusing someone of a crime to a private citizen." Although not necessarily an inaccurate statement of the law,[9] the instruction is nonetheless inadequate and could have reasonably confused or misled the jury because it wrongly suggested that Acuna had no qualified privilege to report the alleged bomb threat to Miranda. There was ample evidence from which the jury could have found that both Acuna and Miranda had an interest in the building's security with respect to a bomb threat.
In defamation cases involving a mutuality of interest in the statement between the speaker and listener, Florida courts have long recognized that such "[a] statement is qualifiedly privileged if made by one who has a duty or interest in the subject matter to one who has a corresponding duty or interest." Knepper v. Genstar Corp., 537 So.2d 619, 622 (Fla. 3d DCA 1988) ; see also Lewis v. Evans, 406 So.2d 489, 492 (Fla. 2d DCA 1981) ("In Florida, a statement made by one having an interest or duty in the subject matter thereof, to another person having a corresponding interest or duty therein, is conditionally privileged, even though the statement may be false and otherwise actionable." (citing Axelrod v. Califano, 357 So.2d 1048, 1051 (Fla. 1st DCA 1978) ("To be qualifiedly privileged the communication must be made by a person having a duty or interest in the subject matter, to another having a corresponding duty or interest.") ) ). The Florida Supreme Court explained the concept of a qualified privilege based on mutuality of interest as follows:
A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.
Nodar v. Galbreath, 462 So.2d 803, 809 (Fla. 1984) (quoting 19 Fla. Jur. 2d Defamation and Privacy § 58 (1980) ). Moreover, the nature of the shared duty or interest "may be public, personal or private, either legal, judicial, political, moral, or social. It need not be one having the force of a legal obligation; it may be one of imperfect obligation. The interest may arise out of the relationship or status of the parties." Lewis, 406 So.2d at 492 (citing *46 Leonard v. Wilson, 150 Fla. 503, 8 So.2d 12, 14 (1942) ); see also Am. Airlines, Inc. v. Geddes, 960 So.2d 830, 833 (Fla. 3d DCA 2007).
In Geddes, American Airlines and a human resources manager were sued for defamation by an employee, Arthur Geddes. 960 So.2d at 831. American Airlines temporarily suspended Geddes, conducted an internal investigation, and ultimately issued a formal reprimand after a coworker reported that Geddes made a threatening statement during a workplace argument. Id. at 831-32. Geddes alleged generally that American Airlines defamed him by republishing the coworker's statement to others and refusing to silence rumors. Id. at 834. This Court ultimately reversed the judgment entered against American Airlines, holding that any statements made by managerial personnel to non-managerial personnel was qualifiedly privileged because those employees were either witnesses to the internal investigation or had an "interest in the disciplinary practices of their employer and in the safety and security of their workplace." Id. at 834.
Here, ISMG and Acuna contend that Acuna had a qualified privilege to report a suspected bomb threat to Miranda because Acuna, as a security guard for New World Tower, had a shared interest with Miranda, as head of security for the Israeli Consulate located in New World Tower, in the safety of the building. In giving a blanket instruction that no person enjoys a qualified privilege to report a potential crime to a private citizen, without including any instruction on a mutuality of interest privilege, the jury was likely misled into thinking there was no circumstance where Acuna was qualifiedly privileged to report an alleged bomb threat to Miranda. For this reason alone, a new trial is required on the intentional tort claims.[10] See Jacobs v. Westgate, 766 So.2d 1175, 1180 (Fla. 3d DCA 2000) ("A jury instruction which tends to confuse rather than enlighten the jury is cause for reversal if it may have misled the jury and caused them to arrive at a conclusion that they otherwise would not have reached ... regardless of whether it has actually been misled."); see also McPhee v. Paul Revere Life Ins. Co., 883 So.2d 364, 368 (Fla. 4th DCA 2004) ("[T]he test for reversible error arising from an erroneous jury instruction is not whether the instruction misled, but only whether it reasonably might have misled the jury.").
We also disagree with the Rollands' contention that any error by the trial court in denying the requested jury instruction was harmless because it was covered by other instructions and that there was overwhelming evidence of express malice. Under Florida law, a showing of express malice is necessary to overcome the qualified privilege. See Water & Sewer Util. Constr., Inc. v. Mandarin Utils., Inc., 440 So.2d 428, 430 (Fla. 1st DCA 1983) ("Where a qualified privilege exists, the plaintiff must prove express malice or malice in fact in order to recover."). "Once it is determined that a qualified privilege exists, a further examination is necessary to determine whether the speaker lost the privilege because of express malice." Cape Publ'ns, Inc. v. Reakes, 840 So.2d 277, 281 (Fla. 5th DCA 2003).
*47 Here, the Rollands contend that any error was harmless and not prejudicial because the trial court instructed the jury on the law enforcement qualified privilege. According to the Rollands, because the jury found that the statements by Acuna were defamatory, they were necessarily made with express malice sufficient to overcome the law enforcement privilege as well as any shared interest privilege. We disagree.
The jury was instructed that Mr. Rolland's defamation claim was based on allegedly false statements made by Acuna, Osuna and Clavero to "the head of security at the Israeli Consulate housed in the New World Tower, the City of Miami Police, and the Federal Bureau of Investigation" regarding the purported bomb threat. However, the jury was also instructed that no person enjoys a "qualified privilege to make a statement accusing someone of a crime to a private citizen." No finding of express malice is necessarily encompassed in the jury's verdict because they were specifically instructed that statements to a private individual like Miranda are never qualifiedly privileged. Moreover, the statements to Miranda occurred before such similar statements were provided to law enforcement. Accordingly, the jury could have reasonably based its defamation verdict exclusively on the statements made by Acuna to Miranda regarding the bomb threat.
Because the jury was instructed that Acuna had no privilege to report a suspected crime to a private individual like Miranda, the risk of jury confusion was exacerbated by the Rollands' repeated assertion that it was wrong for Acuna, Osuna, or Clavero to contact Miranda before first calling 911. As such, the Rollands are unable to satisfy their burden, as the beneficiary of the erroneous jury instruction, of showing there is no reasonable possibility that the error contributed to the verdict. See Special v. W. Boca Med. Ctr., 160 So.3d 1251, 1256 (Fla. 2014) ("To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict."). Based on the foregoing, we are compelled to reverse for a new trial on the intentional tort causes of action due to the prejudice to ISMG and Acuna caused by the trial court's erroneous jury instruction.
B. The Negligence Claims
In addition to the malicious prosecution and defamation intentional torts, Mr. Rolland also raised a general claim for negligence seeking damages from Acuna, Osuna and Clavero for their alleged negligent reporting to law enforcement that Mr. Rolland committed a crime by making a bomb threat. Under the same negligence claim, Mr. Rolland also sought to recover damages from ISMG for its alleged failure to properly investigate the July 25, 2011 incident and for failing to adequately train and supervise Acuna. Mr. Rolland also raised a separate claim against ISMG for the alleged negligent hiring of Acuna. ISMG and Acuna contend the trial court erred in denying their motion for directed verdict because the negligence claims were unsupported by the evidence and legally invalid.
"A defendant is entitled to a directed verdict when 'the plaintiff has failed to provide evidence that the negligent act more likely than not caused the injury,' but a directed verdict is improper '[i]f the plaintiff has presented evidence that could support a finding that the defendant more likely than not caused the injury.' " Friedrich v. Fetterman & Assocs., P.A., 137 So.3d 362, 365 (Fla. 2013) (quoting Cox v. St. Josephs Hosp., 71 So.3d 795, 801 (Fla. 2011) ).
In reviewing a trial court's denial of a motion for a directed verdict, an appellate *48 court must evaluate the evidence in the light most favorable to the nonmoving party. See Trek Bicycle Corp. v. Miguelez, 159 So.3d 977, 979 (Fla. 3d DCA 2015) (citing Posner v. Walker, 930 So.2d 659, 665 (Fla. 3d DCA 2006) ). Moreover, the motion for a directed should only be granted "where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." Owens v. Publix Supermarkets, Inc., 802 So.2d 315, 329 (Fla. 2001) ; Greenberg v. Schindler Elevator Corp., 47 So.3d 901, 903 (Fla. 3d DCA 2010) (citing Banco Espirito Santo Int'l., Ltd. v. BDO Int'l., B.V., 979 So.2d 1030, 1032 (Fla. 3d DCA 2008) ).
It has been recognized in Florida that public policy supports providing redress for individuals who are injured as a result of incorrect reports to law enforcement but are unable to raise a malicious prosecution cause of action. Valladares v. Bank of Am. Corp., 197 So.3d 1, 10 (Fla. 2016) ("[P]ublic policy supports the conclusion that those who are injured as a result of incorrect reports to the police should have access to redress for injuries."). Therefore, the Florida Supreme Court held that:
[A] cause of action is available to one injured as a result of a false report of criminal behavior to law enforcement when the report is made by a party which has knowledge or by the exercise of reasonable diligence should have knowledge that the accusations are false or acts in a gross or flagrant manner in reckless disregard of the rights of the party exposed, or acts with indifference or wantonness or recklessness equivalent to punitive conduct.
Id. at 2.[11]
However, Florida's single publication/single action rule precludes the recasting of defamation claims as additional, distinct causes of action in tort if all of the claims arise from same defamatory publication. See Fridovich v. Fridovich, 598 So.2d 65, 69 (Fla. 1992) ("It is clear that a plaintiff is not permitted to make an end-run around a successfully invoked defamation privilege by simply renaming the cause of action and repleading the same facts."); see also Ovadia v. Bloom, 756 So.2d 137, 141 (Fla. 3d DCA 2000) (explaining that multiple actions are not permitted under the single publication/single action rule when they arise from the same publication upon which a failed defamation claim is based); Edelman v. Kolker, 194 So.2d 683, 684 (Fla. 3d DCA 1967) ("The general rule in Florida is that only one cause of action arises out of a single tort committed on an individual, even though that tort results in damages to both the person and his physical property.").
Here, Mr. Rolland raised a claim against Acuna for negligent reporting of a crime that was based on the same facts and purported defamatory publication underlying Mr. Rolland's defamation claim. Callaway Land & Cattle Co., v. Banyon Lakes C. Corp., 831 So.2d 204, 208 (Fla. 4th DCA 2002) ("The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." (quoting Messenger v. Gruner + Jahr USA Publ'g, 994 F.Supp. 525, 531 (S.D.N.Y. 1998), vacated on other grounds, 208 F.3d 122 (2000) ) ); Byrd v. Hustler Magazine, Inc., 433 So.2d 593, 595 (Fla. 4th DCA 1983) (rejecting an invasion of privacy claim because it was based on "the same factual allegations and legal argument"
*49 as the defamation claim). Accordingly, we agree with ISMG and Acuna that the trial court erred in denying their motion for a directed verdict on the claim for negligent reporting of a crime.
Mr. Rolland's additional grounds for relief under the negligent reporting of a crime claim are also insufficient. First, Mr. Rolland sought to recover damages from ISMG for its alleged failure to adequately investigate the July 25, 2011 incident. However, such a claim necessarily fails because the record is silent as to how ISMG's purported failure to properly investigate the July 25, 2011 incident contributed in any way to Mr. Rolland's asserted injury. "In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." Siegel v. Cross Senior Care, Inc., 239 So.3d 738, 741 (Fla. 3d DCA 2018) (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1017 (Fla. 1984) ).
Second, Mr. Rolland sought damages from ISMG based on its purported failure to properly train and supervise Acuna. "Liability for negligent supervision or retention, however, occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as investigating, discharge or reassignment." G4S Secure Sols. USA, Inc. v. Golzar, 208 So. 3d 204, 208 n.4 (Fla. 3d DCA 2016) (quoting Malicki v. Doe , 814 So.2d 347, 362 n.15 (Fla.2002) ); see also Iglesia Cristiana La Casa Del Señor, Inc. v. L.M., 783 So.2d 353, 358 (Fla. 3d DCA 2001) (citing M.V. v. Gulf Ridge Council Boy Scouts of Am., Inc., 529 So.2d 1248 (Fla. 2d DCA 1988) ). Here, there was no evidence that ISMG knew or should have known of Acuna's alleged unfitness. Acuna's personnel file did not contain any formal reprimands and neither his supervisor nor the ISMG representative were aware of any disciplinary write-ups prior to July 2011. Acuna was recommended to ISMG by New World Tower after already working directly for the building as a licensed security guard. Moreover, there simply was no evidence to suggest that ISMG failed to provide adequate training.
Finally, Mr. Rolland raised a separate claim against ISMG for negligent hiring. "A claim for negligent hiring arises when, before the time the employee is hired, the employer knew or should have known that the employee was unfit." Malicki, 814 So.2d at 362 n.15. In order for Mr. Rolland to raise a prima facie claim of negligent hiring against ISMG, he must show:
(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known.
Id. (quoting Garcia v. Duffy, 492 So.2d 435, 440 (Fla. 2d DCA 1986) ).
The Rollands argue that there was substantial evidence of ISMG's failure to conduct an adequate background search on Acuna before hiring him as a security guard for New World Tower. According to the Rollands, ISMG was therefore negligent in hiring Acuna because it failed to discover Acuna's 1993 arrest, which would have precluded his hiring for a position at New World Tower pursuant to the service contract between ISMG and Panther Management.
The record, however, demonstrates that Mr. Rolland is unable to satisfy any enumerated *50 factor articulated in Malicki. The evidence adduced at trial demonstrates that Acuna was already a licensed security guard for New World Tower and was recommended by the building when ISMG assumed responsibility for providing security services. An industry standard seven-year background check was performed prior to Acuna's employment, which indicated no criminal record. Even if made aware of Acuna's 1993 arrest, the ISMG representative testified that he would have let Panther Management make the ultimate decision on a proper course of action because Acuna was a recommended hire by ISMG's client. There also were no formal reprimands in Acuna's personnel file.
Moreover, neither the internal ISMG procedures nor the services contract between ISMG and Panther Management established a duty of care sufficient to provide Rolland a basis of recovery under a negligent hiring cause of action. See Dominguez v. Publix Super Markets, Inc., 187 So.3d 892, 895 (Fla. 3d DCA 2016) ("[I]nternal safety policies do not themselves establish the standard of care owed to the plaintiff."); see also Dent v. Dennis Pharmacy, Inc., 924 So.2d 927, 929 (Fla. 3d DCA 2006) (affirming dismissal of plaintiff's negligence claim where there was no privity between the parties and the plaintiff was not "a known or identifiable third party").
Furthermore, there was no connection between Acuna's 1993 arrest for grand theft and the alleged underlying intentional torts of malicious prosecution and defamation at issue here. Even if known to ISMG, Acuna's arrest almost 23 years prior would not have made Acuna's purported defamatory statements accusing Mr. Rolland of making a bomb threat foreseeable. See Garcia, 492 So.2d at 442 (explaining that even if an employer had known about an employee's previous "conviction for night-prowling or his assault-and-battery charge that had occurred almost twenty years earlier, we do not consider that this knowledge would have made it foreseeable that the employee would react to his dog's death by physically attacking a person who accidentally caused the dog's death"). Thus, admission of Acuna's 1993 arrest was improper and constituted an impermissible attack on character. See Dickinson v. Gonzalez, 839 So.2d 709, 714 (Fla. 3d DCA 2003). Based on the foregoing, a directed verdict should have been entered in favor of ISMG and Acuna on Mr. Rolland's negligence claims.
C. Improper Evidence and Closing Arguments
As previously discussed, we are reversing for a new trial on the intentional tort claims and for entry of a directed verdict in favor of ISMG and Acuna on the negligence claims. As an additional basis for reversal, we address the errors described below.
"A trial court's discretion regarding counsel's improper arguments to the jury is guided by whether the comments and arguments were 'highly prejudicial and inflammatory.' " Fasani v. Kowalski, 43 So.3d 805, 809 (Fla. 3d DCA 2010) (quoting SDG Dadeland Assocs., Inc. v. Anthony, 979 So.2d 997, 1001 (Fla. 3d DCA 2008) ). This Court has consistently held that statements by an attorney accusing the opposing party or counsel of hiding evidence and thereby fraudulently preventing the admission of relevant evidence can constitute reversible error. See SDG Dadeland, 979 So.2d at 1001 ("We find that given the absence of any evidence showing that either [Defendant] or its counsel hid evidence or acted improperly, any argument by Plaintiff's counsel implying that defense counsel was hiding evidence was both egregious and prejudicial to [Defendant]."
*51 ); see also Sanchez v. Nerys, 954 So.2d 630, 632 (Fla. 3d DCA 2007) (requiring a new trial because "arguments to the jury that defense counsel was 'pulling a fast one,' 'hiding something,' and 'trying to pull something,' was tantamount to calling defense counsel liars and accusing them of perpetrating fraud upon the court and jury"); Emerson Elec. Co. v. Garcia, 623 So.2d 523, 525 (Fla. 3d DCA 1993) (reversing for a new trial where a series of inquiries by plaintiff's counsel accused defense counsel of hiding evidence, putting up roadblocks to the discovery of relevant evidence, and perpetrating fraud).
Considering there was no evidence that the south lobby camera recording was missing because of spoliation or concealment, the pervasive inquiries by the Rollands' counsel into the security cameras and missing recording implied to the jury that the south lobby recording was hidden or destroyed because it would have been unfavorable to the defense. Indeed, the Rollands suggested improper conduct surrounding the missing recording during opening arguments, with counsel for the Rollands declaring that "the only tape when the FBI asked for the tape of the lobby, the only tape given was the tape from the north camera pointing south." Despite a pre-trial limiting instruction, the concealed recording theme was implied throughout trial over objections, even prompting a juror question as to why only one camera feed was provided to the FBI.
Moreover, counsel for the Rollands pointedly attacked the credibility of the defense during closing arguments, telling the jury over defense counsel's objection that "human nature never changes and liars will be liars and they'll stay liars for eternity." While such implications are clearly misleading and prejudicial in general, they are further exacerbated here because any south lobby recording of the front sidewalk outside of the New World Tower lobby has little probative value to Mr. Rolland's intentional tort claims. The security camera system had no audio capability and the south lobby camera would not have captured Mr. Rolland's purported bomb threat inside the lobby. Furthermore, counsel for the Rollands conceded that a request to preserve the south lobby camera recording was never made. Accordingly, these arguments were improper and should be avoided in the future. See Wall v. Costco Wholesale Corp., 857 So.2d 975, 976 (Fla. 3d DCA 2003) (concluding reversal was required because of remarks by defense counsel regarding why the plaintiffs failed to call their daughter as a witness when defense counsel knew the daughter was estranged); see also Johnnides v. Amoco Oil Co., 778 So.2d 443, 443-44 (Fla. 3d DCA 2001).
Next, we address additional improper statements made by the Rollands' counsel during closing argument concerning Acuna's previous arrest and Mr. Rolland's good character. The prejudice arising from the irrelevant admission of Acuna's 1993 arrest was compounded by the repeated references to Mr. Rolland's contrasting good character evidence. In contrast to the negative testimony regarding Acuna's prior arrest and past employment, a positive illustration of Mr. Rolland was painted via testimony regarding his good character, professional reputation, and respectful conduct. Mr. Rolland contends that evidence regarding Acuna's prior arrest was relevant to his claim of negligent hiring against ISMG, while any good character evidence went to establishing damages and to also rebut the accusation that he used profane language or acted aggressively.
Relevancy, however, is not the exclusive metric for admissibility. "Relevant evidence is inadmissible if its probative value *52 is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2016). Here, any probative value regarding Acuna's almost 23-year-old arrest, without conviction, was substantially outweighed by the risk of unfair prejudice and confusion of the issues.
Moreover, the remoteness in time and dissimilar facts between his 1993 theft arrest and the alleged torts here further support a determination that discussion of Acuna's 1993 arrest should have been excluded. See Smith v. Hooligan's Pub & Oyster Bar, Ltd., 753 So.2d 596, 600 (Fla. 3d DCA 2000) ("However, 'evidence of a person's character which is offered only as tending to prove the probability that he or she acted in a manner consistent with that character on a particular occasion is generally inadmissible.' " (quoting Pino v. Koelber, 389 So.2d 1191, 1193 (Fla. 2d DCA 1980) ) ); see also § 90.404(2)(a), Fla. Stat. (2016). The prejudicial impact was compounded by related inflammatory statements made during closing arguments by the Rollands' counsel.
During closing, counsel for the Rollands first emphasized that Acuna's prior arrest should have precluded his assignment to New World Tower based on the ISMG contract with Panther Management. The Rollands' counsel then asked the jury to consider how to compensate someone "who was never arrested before in his life," and "for 52 years played by the rules," and "who never had a parking ticket." Counsel for the Rollands then implored the jury to "do what you think is right" before reminding them that "Mr. Acuna still works in the building." At the end of his closing, the Rollands' counsel implored the jury to "validate my client" and asked "[w]ho unleashed Jorge Acuna on the public?" Defense counsel objected and moved for a mistrial on the collective impropriety of the closing comments, which the trial court denied. We agree that these comments are improper.
IV. CONCLUSION
Based on the foregoing, we conclude that the trial court's decision to submit an erroneous jury instruction omitting a valid request for a qualified privilege defense was an abuse of discretion resulting in reversible error. Additionally, because no proper and reasonable view of the evidence could sustain a verdict on the negligence claims, we reverse for the court below to direct a verdict in favor of ISMG and Acuna. We affirm the trial court's partial denial of the Rollands' motion for leave to amend their complaint to state a claim for punitive damages against ISMG.
Reversed in part, affirmed in part, and remanded for additional proceedings.

On October 8, 2015, the trial court entered an order granting the Rollands' motion to amend their second amended complaint to add a claim of punitive damages against all defendants below. However, on October 21, 2015, the trial court vacated the October 8, 2015 order and granted the Rollands' leave to amend their second amended complaint to state a claim for punitive damages against all defendants below except ISMG.

While testifying at trial, Acuna referred to the large case Mr. Rolland brought into the lobby as a "box."

Mr. Rolland testified that he mistakenly thought the business executive he was scheduled to interview the next day was also the owner of New World Tower.

Officer Mendez testified that, as one of two downtown neighborhood resource officers, she serves as a liaison between the City of Miami Police Department and the downtown community. Officer Mendez further testified that her number was well known in the downtown neighborhood, had previously met Miranda on several occasions, and that calling her is just as effective as calling 911.

During a videotaped deposition on February 24, 2015, Special Agent Andrew Thomas of the Federal Bureau of Investigation testified that he viewed the lobby security camera footage on the day of the incident and requested a copy of the lobby recording the same or following day. Agent Thomas testified that he personally picked up the security camera recording from Acuna at the security desk a few days later. There was no indication from Agent Thomas' testimony that he requested the south lobby camera recording that depicted the outside of New World Tower.

Albert Hammond testified that on July 25, 2011, he was employed as a network operation director by a company called TeleSwitch, which was contracted to manage the telecom data center for the entire New World Tower office building. Clavero testified that, while Hammond was the only person who knew the passcode to access the security camera system on the day of the incident, he subsequently contacted TeleSwitch-after Hammond ceased working at New World Tower-to obtain the passcode required to access security camera system.

The Rollands' counsel also repeatedly asked Acuna and other witnesses about whether Acuna was terminated from a previous security guard position at a bank and if Acuna had purposefully omitted that prior bank employment on his application to ISMG. Acuna strongly denied that he was terminated, explained that he had only been warned not to leave his post for a coffee break, and testified that he voluntarily resigned because of dissatisfaction with post changes.

We decline to address the cross-appeal, as we find no error in the trial court's decision denying the Rollands' motion for leave to amend their complaint to include a claim for punitive damages solely against ISMG.

Fridovich v. Fridovich, 598 So.2d 65, 69 n.8 (Fla. 1992) ("[W]e emphasize that the privilege only applies to statements voluntarily made to the police or a prosecuting attorney and not to defamatory statements made to private individuals.").

At a minimum, the jury should have determined whether a mutuality of interest qualified privilege existed. See Knepper, 537 So.2d at 622 ("Where the circumstances and content of allegedly defamatory statements are clearly disputed by the parties, the jury should determine, under proper instructions from the court, whether or not the communication was privileged.").

Unlike the instant case, the plaintiff in Valladares "had no cause of action for malicious prosecution because he was never arrested or prosecuted." 197 So.3d at 10.